**Shahid IQBAL, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 55A04–0311–CR–564.

Court of Appeals of Indiana.

March 22, 2004.

Patrick M. Schrems, Bloomington, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Joby Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### *STATEMENT OF THE CASE*

Appellant–Defendant, Shahid Iqbal (Iqbal), appeals his conviction for Count I, murder, Ind.Code §§ 35–42–1–1(1), 35–50–2–3; Count II & III, criminal confinement with a deadly weapon, a Class B felony, I.C. §§ 35–42–3–3(1), 35–50–2–5; Count IV, neglect of a dependent, a Class D felony, I.C. §§ 35–46–1–4(a)(1), 35–50–2–5; Count V, carrying a handgun without a license, a Class A misdemeanor, I.C. §§ 35–47–2–1, 35–50–3–2; and Count VI, invasion of privacy, a Class B misdemeanor, I.C. §§ 35–46–1–15.1(a)(1), 35–50–3–3.

We affirm.

### *ISSUES*

Iqbal raises two issues on appeal, which we restate as follows:

1. Whether the trial court erred by admitting evidence of Iqbal's prior bad acts to show intent, motive, relationship of

the parties, or absence of mistake or accident when it balanced the probative value of the evidence against its prejudicial effect by limiting the evidence to events that occurred one year prior to the victim's death; and

2. Whether the trial court erred by admitting into evidence expert testimony on domestic violence.

## FACTS AND PROCEDURAL HISTORY

Iqbal and Tammy Iqbal (Tammy) were married in 1995. Iqbal was originally married to Tammy's mother; however, after their divorce he married Tammy.[1] Iqbal and Tammy had a rocky and unstable marriage and by July 6, 2002, Tammy had moved into an apartment at 66 East Main Street, in Mooresville, Indiana. She was in the process of divorcing Iqbal and had a new boyfriend. At first, Iqbal accepted Tammy's decision, but later he told Tammy's sister that "nobody could ever have her if he couldn't have her." (Transcript pp. 903–04).

Previously, on March 18, 2002, Iqbal placed a gun against Tammy's head and threatened to kill her. She managed to talk "the gun down" and when Iqbal placed the gun on the refrigerator, she fled to Allen's Body Shop. (Tr. p. 731). Captain Richard Allen of the Mooresville Police Department (Captain Allen) questioned Iqbal, who denied the fight with Tammy and the existence of the gun in the apartment. Nonetheless, Captain Allen discovered the gun on top of the refrigerator. As a result of Iqbal's action, the trial court issued a protective order. The State charged Iqbal with criminal confinement, pointing a firearm, and trespassing. These charges were pending as of July 4, 2002.

On July 4, 2002, ten-year-old A.I. spent the night with her father, Iqbal, and returned to her mother's apartment the next day. When A.I. awoke on the morning of July 6, 2002, Iqbal was in the apartment arguing with Tammy while he had a gun in his hand. Although Tammy and A.I. attempted to leave the apartment several times, Iqbal continually grabbed Tammy's shoulder while holding the gun. While in the front room of the apartment, Tammy took the gun from Iqbal, removed the bullets from the magazine, and threw them on the floor. During this argument, A.I. was scared and dropped down on the floor several times. Eventually, Iqbal grabbed Tammy's fingers, pulled them backwards, and wrestled the gun from Tammy's hands. Once he gained control over the weapon, Iqbal reloaded it.

When the argument quelled, Iqbal and Tammy resumed talking. Iqbal stood at the end of a counter while Tammy sat a few feet away in a chair at the kitchen table. A.I. was nearby, playing with her brother's game boy when she heard a gunshot. Immediately after the shot, A.I. noticed the gun on the counter and observed Iqbal sitting on the couch. A.I. started crying, threw the game boy across the room, and ran from the apartment. Janice Smith (Janice), a neighbor who was standing on her porch, attempted to calm A.I. When Janice took A.I. back to the apartment, she observed Iqbal with the telephone in his hand, picking up the gun from the counter. At no time did Iqbal approach Tammy or console A.I. During interrogation by the Mooresville Police Department, Iqbal claimed that the gun "went off by itself." (Appellant's App. p. 128). He further stated that he and Tammy were getting along well and "had sex and everything" the night before he shot

---

1. The record shows that Iqbal was Tammy's step-father, not her biological father.

her. (Appellant's App. p. 83). Tammy later died from her wounds at the hospital.

On July 8, 2002, the State filed an information against Iqbal, charging him with Count I, reckless homicide, later amended to murder, Ind.Code §§ 35–42–1–1(1), 35–50–2–3; Count II & III, criminal confinement with a deadly weapon, a Class B felony, I.C. §§ 35–42–3–3(1), 35–50–2–5; Count IV, neglect of a dependent, a Class D felony, I.C. §§ 35–46–1–4(a)(1), 35–50–2–5; Count V, carrying a handgun without a license, a Class A misdemeanor, I.C. §§ 35–47–2–1, 35–50–3–2; and Count VI, invasion of privacy, a Class B misdemeanor, I.C. §§ 35–46–1–15.1(a)(1), 35–50–3–3. On September 10, 2002, the State filed its 404(b) Motion, amended on February 12, 2003, to introduce the evidence of Iqbal's prior bad acts during trial. On May 1, 2003, the trial court conducted a hearing on the State's Motion to introduce 404(b) evidence. Subsequently, on May 30, 2003, the trial court issued its Order, stating in pertinent part:

> [t]herefore the [c]ourt, having evaluated the evidence the State seeks to admit by the standards set out above, now finds the evidence is relevant because [Iqbal] denies any intent to commit murder and specifically alleges that the shooting was accidental. The [c]ourt finds that the probative value of the evidence which occurred one year prior to Tammy's death on July 6, 2002, outweighs the prejudicial effect. However, no 404(b) evidence for incidents prior to July 7, 2001, will be allowed unless the defense would open the door to such evidence. Because [Iqbal] has gone beyond merely denying he intentionally committed the shooting and is claiming "accident," the State may refer to the allowable 404(b) evidence prior to [Iqbal] putting it in issue at the trial if the evidence is legally admissible on all other grounds.

(Appellant's App. p. 43).

On June 2 through June 6, 2003, a jury trial was held. During the jury trial, the trial court issued a limine instruction to the jury advising them to consider the character evidence only as it related to Iqbal's intent, motive, relationship with Tammy, and absence of mistake or accident. At the end of the jury trial, the jury returned a guilty verdict on all charges. On July 3, 2003, the trial court conducted a sentencing hearing. During this hearing, the trial court sentenced Iqbal to a cumulative term of fifty-eight years at the Indiana Department of Correction.

Iqbal now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Prior Bad Acts

Iqbal first alleges that the trial court committed reversible error by allowing the State to introduce evidence during its case-in-chief of his prior bad acts committed between July 7, 2001, and July 6, 2002. Specifically, Iqbal asserts that the trial court erred when it admitted evidence of these prior acts, in particular the March 18, 2002 incident, because Iqbal never went beyond a mere denial of the murder and affirmatively presented a claim of contrary intent. Conversely, the State contends that the trial court properly admitted the character evidence to show, individually or a combination of, motive, intent, relationship between the parties, or lack of accident or mistake. Alternatively, even if the admission of the evidence was erroneous, the State maintains that the error was harmless due to the substantial amount of evidence of Iqbal's intent to commit murder presented at trial.

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind.1997), *reh'g denied*, *cert. denied*. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind.1997), *reh'g denied*. However, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Timberlake*, 690 N.E.2d at 255. Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *Stephenson v. State*, 742 N.E.2d 463, 481 (Ind.2001), *cert. denied*.

Indiana Evidence Rule 404(b) provides, in pertinent part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

This rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so-called 'forbidden inference.' " *Hicks. v. State*, 690 N.E.2d 215, 218–19 (Ind.1997). Thus, in assessing the admissibility of evidence under Ind. Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evid. R. 403. *Id.* at 221. To determine whether the trial court abused its discretion, we employ the same test. *See, e.g., id.* at 221–23.

## B. Intent

Iqbal alleges that the trial court erred by admitting his prior bad acts as evidence of intent since he did not affirmatively present a claim of contrary intent during his counsel's opening statement or during the trial itself. On the other hand, the State contends that the combination of Iqbal's pre-trial statement and his counsel's opening statement was sufficient to raise a claim of contrary intent. As such, the State maintains that the trial court properly admitted evidence of Iqbal's prior bad acts.

Evidence of prior bad acts is relevant to negate a claim of contrary intent. In *Wickizer v. State*, 626 N.E.2d 795 (Ind. 1993), our supreme court provided guidance on the application of Evid. R. 404(b) in future cases, examining specifically the intent exception of the rule. *Wickizer* held that the intent exception was available only when a defendant went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent. *Id.* at 799.

In this respect, intent is unlike the other listed exceptions in Evid. R. 404(b). Intent is often an element of the crime and is likely to be found relevant. *See Hicks*, 690 N.E.2d at 224 fn. 12. A prior intent to commit a bad act, however, although of some relevance, "introduces the substantial risk of conviction based predominately on bad character," because, since the defendant meant to cause harm before, he must therefore have meant to cause harm in this case. *Wickizer*, 626 N.E.2d at 797. Because of this danger, our supreme court

in *Wickizer* narrowly construed the intent element. *Id.* at 799.

■ Consequently, the intent exception in Evid. R. 404(b) will only be available when a defendant alleges a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief. *Id.* The State may then respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. *Id.* This narrow construction was somewhat extended in *Whitehair v. State*, 654 N.E.2d 296 (Ind.Ct.App.1995). In *Whitehair*, we found that the effect of a defendant's pretrial statement to police, combined with his counsel's opening remarks, placed defendant's intent at issue. *Id.* at 302.

We disagree with the State that, in the present case, a combination of Iqbal's pretrial statement to Captain Allen and his counsel's opening statement was sufficient to raise a claim of contrary intent in the present case. During Iqbal's interrogation by Captain Allen, the following exchange occurred:

> CAPTAIN ALLEN: [Iqbal], I'm going to ask you again, did you intend to shoot your wife?
>
> IQBAL: No, I,.. oh my God, I loved that woman so much. I still.. my heart is full of her pictures. My house, I still got her pictures. Any girl will talk to me and I'll say I'm still married.
>
> . . .
>
> CAPTAIN ALLEN: [Y]ou never intended to shoot your wife?
>
> IQBAL: No. And anybody.. I won't even shoot a dog.

> . . .
>
> IQBAL: [W]ell the thing was I didn't intend to just pull the trigger or something. It just.. it just came halfway. It wasn't like, you know pointed at her.

(Appellant's App. pp. 80–3). However, our review of the record discloses that, besides attempting to insert doubt as to the State's burden of proof, Iqbal's defense counsel did not claim during trial that Iqbal unintentionally shot Tammy. Thus, mindful of the narrow intent construction promulgated by our supreme court, evidence of Iqbal's prior bad acts cannot be admitted under the intent exception of Evid. R. 404(b) since he did not affirmatively present a particularized claim of contrary intent. *See Wickizer*, 626 N.E.2d at 799.

### C. Motive, relationship between the parties, absence of mistake or accident

■ Next, the State contends that evidence of Iqbal's prior bad acts, in particular the March 18, 2002 incident, was properly admitted as relevant evidence of motive, relationship between Iqbal and Tammy, and absence of mistake or accident. We agree.

■ In *Hicks*, our supreme court clearly distinguished the intent exception of Evid. R. 404(b) from the other exceptions under this rule. *See Hicks*, 690 N.E.2d at 224 fn. 12. The relevance and admissibility of motive is tied to the facts of the specific crime. *Id.* A bad relationship between the defendant and another person does not bear on the defendant's motive to harm the victim and will rarely be either relevant or admissible to show motive for the charged conduct. *Id.* For this reason, evidence offered to show motive is less likely than intent to be relevant as a general matter and thus to create the forbidden inference. *Id.* Accordingly, our supreme court expressly held that *Wickizer* does

not apply to all exceptions under Evid. R. 404(b). *Id.* Consequently, Iqbal does not need to affirmatively advance a contrary claim of motive or absence of accident prior to the State's introduction of prior bad act evidence. Rather, it is sufficient that the evidence of Iqbal's prior bad acts is relevant to a matter at issue, other than Iqbal's propensity to murder Tammy. *See, e.g., Pickens v. State,* 764 N.E.2d 295, 298 (Ind.Ct.App.2002)

▮ Numerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime. *See Hicks,* 690 N.E.2d at 222; *see also, e.g., Haggenjos v. State,* 441 N.E.2d 430, 431 (Ind.1982) (the supreme court held that Haggenjos' jealous behavior after his wife filed for divorce was admissible as evidence of his motive for killing her).

Here, we find the March 18, 2002 incident probative of the relationship between Iqbal and Tammy and his hostility towards her. Specifically, the record reflects that on March 18, 2002, Iqbal argued with Tammy, put a gun to her head, and threatened to kill her. Questioned by the Mooresville police regarding this incident, Iqbal claimed that, other than a minor disagreement, nothing had happened. He further denied the existence of a gun. Nevertheless, the record indicates that Iqbal was arrested, charges were filed and pending at the time of the murder, and a protective order was issued. Moreover, in his statement to Captain Allen on July 6, 2002, Iqbal asserts that prior to shooting her, he had "sex and everything" with Tammy. (Appellant's App. pp. 82–3). He emphatically denied arguing with Tammy on that day. Based on these facts, we find the evidence relating to the March 18, 2002 incident indicative of Iqbal's relationship with Tammy and highly relevant for his motive to shoot her. *See Hicks,* 690 N.E.2d at 222.

▮ Furthermore, Iqbal contends that his pre-trial statement, "[t]he gun went off by itself" does not constitute an accident theory for the purpose of invoking Evid. R. 404(b) because he did not affirmatively advance a contrary defense during trial. Rather, Iqbal contends that this statement goes towards his intent. We disagree. Iqbal's assertion of an accident is indicative of the nature of the relationship between the parties, characterized by jealousy and denial, and ultimately culminating into hostility and murder. Since the statement is relevant to the nature of the relationship between Iqbal and Tammy, the State can introduce evidence of prior acts, without Iqbal specifically advancing a contrary defense. *See, e.g., Pickens,* 764 N.E.2d at 298.

▮ Moreover, Iqbal's statement is also a reference to a possible accident defense which would allow the State to introduce evidence of other crimes or acts to show the absence of an accident. *See* Evid. R. 404(b). Particularly, the record reflects that Iqbal used a gun to subdue Tammy during the March 18, 2002 incident. Furthermore, Iqbal's friend, Tim Grafe, testified that Iqbal had shot weapons before and was pretty proficient in handling them. Therefore, this evidence is relevant to show the absence of the gun accidentally being fired. Consequently, we find this evidence admissible under Evid. R. 404(b). *See Hicks,* 690 N.E.2d at 222.

### D. Probative Value

▮ Although the evidence was relevant to show motive, relationship between the parties, and absence of mistake, it may

still be inadmissible under the second prong of the 404(b) test if its probative value is substantially outweighed by the danger of unfair prejudice pursuant to Evid. R. 403. *See Hicks*, 690 N.E.2d at 221. When inquiring into relevance, the trial court "may consider any factor it would ordinarily consider under Rule 402." *Id.* Such factors include the similarity and proximity in time of the prior act, as well as tying the prior act to the defendant." *Id.*

We agree with the State that the trial court properly balanced the evidence against its prejudicial effect by limiting the amount of admissible character evidence. Here, the trial court's pre-trial order prohibited the State from inquiring into any incidents prior to July 7, 2001, one year prior to Tammy's death, even though the State had evidence of prior bad acts dating to 1998. Therefore, we find that, while the facts of the March 18, 2002 incident may be prejudicial, its probative value regarding Iqbal's motive and relationship with Tammy was not outweighed. *See id.* Moreover, the trial court specifically instructed the jury to consider the prior bad acts only on the issue of motive, relationship with Tammy, and absence of mistake or accident. Consequently, we conclude that the trial court did not abuse its discretion by admitting Iqbal's prior bad acts under Evid. R. 404(b). *See id.*

## II. Expert Testimony

Lastly, Iqbal claims that the trial court erred by admitting expert testimony on domestic violence. Specifically, he asserts that the State's use of the phrase "domestic violence" during voir dire was highly prejudicial in nature. Further, Iqbal contends that the expert testimony regarding domestic violence was merely introduced to bolster certain aspects of the State's

case. Conversely, the State maintains that, under Evid. R. 702(a), the trial court did not abuse its discretion by admitting expert testimony to educate the jury on domestic violence.

Indiana evidence rule 702 provides that a witness may be qualified as an expert by virtue of the witness's "knowledge, skill, experience, training, or education." *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003). Expert scientific testimony is admissible if: (1) it satisfies the above standard, (2) the scientific principles upon which the expert testimony rests are reliable, and (3) the testimony's probative value is not substantially outweighed by the danger of unfair prejudice. *Hall v. State*, 796 N.E.2d 388, 399 (Ind.Ct.App.2003), *trans. denied.* It is within the trial court's sound discretion to decide whether a person is qualified as an expert witness. *Id.*

At the outset we observe that although Iqbal objected to the use of the term "domestic violence" during the State's voir dire, he nevertheless fails to raise a coherent argument on appeal. *See* Ind. Appellate Rule 46(A)(8)(a). Therefore, we find this argument waived.

Furthermore, we find Iqbal's contention that the expert's testimony merely politicized certain aspects of the State's case to be without merit. Our supreme court has previously held that expert testimony of battered woman's syndrome [2] introduced against the husband/defendant is admissible provided it is relevant. *See Isaacs v. State*, 659 N.E.2d 1036, 1041 (Ind.1995), *cert. denied.* Here, the State proffered the expert testimony to explain Tammy's reason for allowing Iqbal to enter her home on July 6, 2002, despite testimony that he assaulted her on March 18, 2002, and a protective order was in place. Additionally, our review of the ex-

---

**2.** We use the term 'battered woman syndrome' as a synonym for 'domestic violence.'

pert's testimony reveals that the expert did not have personal knowledge of the case and had not counseled Tammy. Rather, the expert merely educated the jury on the complexity of behavior of domestic violence victims. As such, the testimony did not cross the line into impermissible vouching. Accordingly, we find that the expert's testimony is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice. *See Hall,* 796 N.E.2d at 399. Therefore, we conclude that the trial court did not abuse its discretion in allowing the expert to testify regarding domestic violence. *See id.*

### CONCLUSION

Based on the foregoing, we find that the trial court properly admitted evidence of Iqbal's prior bad acts to show motive, relationship of the parties, and absence of accident when it balanced the probative value of the evidence against its prejudicial effect by limiting the evidence to events that occurred one year prior to Tammy's death. We further hold that the trial court did not err by admitting expert testimony on domestic violence.

Affirmed.

DARDEN, J., and BAILEY, J., concur.