**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 25 2013, 6:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CLAY M. PATTON**
Osan & Patton, LLP
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J. T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARK R. HURST, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1209-CR-391 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable Mary R. Harper, Judge
Cause No. 64D05-1201-FC-285

**July 25, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Mark Hurst (Hurst), appeals his conviction for robbery, a Class C felony, Ind. Code § 35-42-5-1; and criminal confinement, a Class D felony, I.C. § 35-42-3-3.

We affirm.

## ISSUES

Hurst raises three issues on appeal, which we restate as follows:

(1) Whether the trial court properly admitted evidence of his prior conviction;

(2) Whether the trial court properly admitted testimony regarding a lost video recording; and

(3) Whether the trial court properly admitted evidence of Hurst's identification by the victim.

## FACTS AND PROCEDURAL HISTORY

In 2008, Kevin Waite (Waite) joined Facebook. Sometime in 2010, Waite started chatting with Natalie Coats (Coats) on Facebook. Waite knew Coats from his freshmen year at school. Waite's hope was to have a relationship with Coats and, he asked her out on a date on several occasions. She kept on putting it off due to other plans but Coats eventually agreed to go out on a date with Waite. On December 4, 2011, Waite and Coats texted each other back and forth. Waite wanted to go to a movie with Coats but Coats wanted to go out to a bar and have fun. Coats then gave Waite the address to a bar, Shenanigan's. When Waite arrived, Coats was already there, together with her friend

2

Brittany Foley (Foley), and two other men, one of which would later be identified as Hurst. Coats and Foley asked Waite to buy them a drink. Waite bought both of the girls a pitcher of beer. The girls introduced Waite to Hurst and the other male. The whole night, the group kept referring to Hurst as 'Alfred', so Waite never learned Hurst's real name.

At some point during the evening, Coats and Foley asked Waite if they could get a ride home and Waite told them that he would think about it. Foley asked Waite for his cell phone so that she could text him later. Foley also inquired if she could get twenty dollars for child support. Waite refused and he told Foley that he was unemployed and could not afford to give her the money. Hurst then approached Waite and told him that he had overheard that Waite did not want to drive Coats and Foley home and that he was going to leave them "high and dry." (Transcript pp. 93-94). As they continued talking, Hurst told Waite to drive him home as well. Waite asked whether it was necessary to drop all of them off and Hurst responded "yes you do if you'd like to keep your precious teeth." (Tr. p. 95). This time, Waite agreed because he felt intimidated and scared. After that, Waite went to the restroom where he wanted to either call his parents or the police for help. However, Hurst followed him to the restroom, cornered him in the stall, and told Waite to show him the last people he called and texted. Waite agreed. At that point, Coats and Foley came into the men's restroom and asked if everything was alright. Out of fear, Waite told the girls that everything was fine, which made them leave the bathroom. Waite walked over to the sink to wash his hands and Hurst informed him

3

"you're disrespecting me and my lady friends so you are going to buy pitchers of beer and shots for us." (Tr. p. 96). Hurst followed Waite to the bar where Waite bought pitchers of beer and shots for all of them. Hurst also told Waite to leave a ten or fifteen dollar tip for the bartender which Waite did out of fear. They drank the first round and Hurst demanded that Waite buys another round of beer and shots. At that point, Hurst had to leave for about 10 minutes, but before he left, he asked his other male friend to follow Waite to the parking lot and beat him up if he tried to leave.

When Hurst returned, he demanded Waite go to the ATM and get twenty dollars for Foley. Waite drove Hurst and Foley to an ATM located at a Marathon gas station close by. Waite got out of the car and went over to the ATM and as he was putting his pin number in, Hurst pushed him aside and told Waite he would do it himself. He then asked Waite to drive to another ATM to get more money. At that time, Hurst had Waite's debit card and cell phone. Hurst handed Waite's debit card to Foley, who entered the Marathon gas station to retrieve more money from Waite's bank account. After returning to Shenanigans, Hurst demanded that they leave again to buy food. Waite drove Foley and Hurst to Dennys. When they got to Dennys, Foley exited the car and asked Waite if he wanted anything, and Waite told her he was okay. Waite tried to get out of the car but Hurst told him to remain seated. At that point, Hurst asked Waite to give him his driver's license so he could write down Waite's information just in case Waite tried to notify the police. Out of fear, Waite handed it to him. Hurst informed Waite that if he attempted to notify the police, Hurst would go over to Waite's house with

4

his buddies and beat him and his family. Hurst also told Waite that he was debating what to do with him next, whether to beat him up, or take his car. Hurst added, "at least you have your life and a little less money." (Tr. p 120). Waite then drove Hurst and Foley to Foley's friend's trailer. When they got to their destination, Hurst and Foley got out of the car. Hurst told Waite his cellphone was in the back seat, he kicked Waite's car, and said, "go, go, go, you know, I'm letting you go." (Tr. p 122).

On January 11, 2012, the State filed an Information, charging Hurst with robbery, a Class C felony, I.C. § 35-42-5-1, and criminal confinement, a Class D felony I.C. § 35-42-3-3. On March 20, 2012, the State amended the Information and added a Habitual Offender Sentence Enhancement Notice. On the same day, the State filed a Second Amended information against Hurst for the same charges.

On April 16, 2012, Hurst filed a motion in limine seeking the suppression of any evidence relating to his previous criminal convictions which occurred more than ten years prior to the instant offenses. On April 25, 2012, the trial court denied Hurst's motion in limine. A jury trial was held on April 23, 25 and 26, 2012. At the close of the evidence, the jury found Hurst guilty as charged. On August 14, 2012, the trial court held a sentencing hearing and sentenced Hurst to six years for his robbery offense enhanced by eight years because of his habitual offender adjudication. The court also sentenced him to two years for the criminal confinement charge. These sentences were to run concurrently.

Hurst now appeals. Additional facts will be provided as necessary.

*I.    Admission of Evidence*

A. *Standard of Review*

Our standard of review in this area is well settled.  The admission of evidence is a determination entrusted to the discretion of the trial court.  *Adkins v. State*, 703 N.E.2d 182, 186 (Ind. Ct. App.1998).  We will reverse a trial court's decision only when the court's action is clearly against the logic and effect of the facts and circumstances before the court.  *Id.*  In reviewing the admissibility of evidence, we consider only the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *See Hyppolite v. State,* 774 N.E.2d 584, 592 (Ind. Ct. App. 2002), *trans. denied.*  If a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected.  *Iqbal v. State,* 805 N.E.2d 401, 406 (Ind. Ct. App. 2004).  "Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Id.*

B. *Prior Conviction*

Hurst first contends that the admission of his prior conviction by contending that the trial court abused its discretion in allowing this evidence to be presented to the jury in violation of Indiana Evidence Rule 609.  Hurst argues that his prior conviction of residential burglary and theft, of which he was convicted of in 1998 and released on

parole on October 18, 1999, fell outside the ten year limitation period as provided by Evid.R.609 (b), and should have been excluded by the trial court.

Evid.R.609 (b) governs the impeachment of a witness by evidence of a prior conviction and provides in pertinent part that:

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or, if the conviction resulted in confinement of the witness then the date of the release of the witness from the confinement unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than ten years old as calculated herein is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Accordingly, we observed that Evid.R. 609 (b) is biased against admissibility. *Dowdy v. State*, 672 N.E.2d 948, 951 (Ind. Ct. App. 1996). *reh'g. denied.* Specifically, it requires the party seeking to impeach with an aged conviction to show that the probative value of the evidence substantially outweighs its risk of unfair prejudice. *Id.* (*quoting United States v. Estes*, 994 F.2d 147, 149 (5th Cir.1993)). Further, the party seeking to overcome Evid. R. 609(b) presumption of exclusion must support the argument for probative value with specific facts and circumstances upon which the trial court may base a finding of admissibility. *Id.*

In *Scalissi v. State,* 759 N.E.2d 618 (Ind. 2001), our supreme court stated that the decision to admit such evidence is dependent on several factors:

> (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past

crime and the charged crimes; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue.

Here, we note that the trial court considered in detail the factors enunciated in *Scalissi* and concluded as follows:

> As to the 609 question that we had pending. And I've done a little bit of looking around on this to be as close to right as I can for you folks. I don't think cases should be tried in a vacuum. But it doesn't mean that the front door is wide open. The state did provide written Notice of Intent to use 609 Evidence. So I will find that there has been sufficient written notice to allow the Defense to challenge the convictions of admissibility, as we certainly had argument on that. The factors that I have looked at in weighing this issue because the convictions at issue, I believe are the [b]urglary and [t]heft. So I looked at impeachment value of the prior crimes, the point in time of the impeachment value of the prior crimes, the point in time of the convictions and the Defendant's subsequent history, similarity between the crimes at issue that the State would like to utilize, and the purpose of course, which would be impeachment, and the charged crimes, the importance of the Defendant's testimony if this will be an impeachment situation, and the centrality of the credibility issue. Obviously credibility is going to be critical. I believe that there is impeachment value to crimes of [b]urglary and [t]heft. I will find that the [t]heft is a crime involving dishonesty or false statement. To the [c]ourt's belief, the Court has not received any evidence showing that the [t]heft that was the basis for the conviction did not involve dishonesty or false statement. [t]heft being the exertion of unauthorized control over the property of another with the intent to deprive them of any part of the value or use of the property. Which goes to, I think, the third factor that the court needs to evaluate, which is the similarity between the past crime or crimes and the charged crime. There does appear to be the commonality of the issue with the [r]obbery and [t]heft and that is the exertion of unauthorized control over the property of another or taking property from another without permission. So I think that is a common element.

(Tr. pp. 244-245). Indeed, based on the *Scalissi* factors, we conclude that Hurst's prior conviction was properly admitted. The impeachment value of Hurst prior conviction was great. The point in time was close to his prior offense of residential burglary and theft. We also find similarity with Hurst's instant conviction to his prior convictions. We view

8

both crimes to have a commonality as they both involve a person knowingly or intentionally taking away the property of another person.

However, Hurst now argues that the State provided insufficient written notice. Evid.R 609 (b) provides that evidence of a conviction more than ten years old shall not be admitted into evidence unless the proponent who intends to use the evidence gives the adverse party sufficient advance written notice of intent to use such evidence. The record reflects that the State gave verbal notice of its intent to use Hurst's prior conviction which triggered Hurst's written motion in limine filled with the trial court on April 16, 2012. In fact, the record shows that the State did not provide written notice until the day of the trial. Thus, Hurst knew that the State intended to introduce the prior convictions into evidence and had advance fair opportunity to contest the State's intent. As such, his rights were not substantially affected and we find the error to be harmless. *See* T.R. 61; See *also Wales v. State,* 768 N.E.2d 513, 523 (Ind. Ct. App. 2002)*, reh'g granted on other grounds,* 774 N.E.2d 116.

Based on these facts, we agree with the trial court that the probative value of Hurst's 1998 robbery conviction substantially outweighed its prejudicial effect. Accordingly, the trial court did not abuse its discretion in finding Hurst's 1998 robbery conviction admissible.

C. *Video Surveillance*

Next, Hurst contends that the trial court abused its discretion by admitting Detective Joe Reynolds' (Detective Reynolds) testimony with respect to a video recording of Hurst, Foley, and Waite at the ATM machines.

Detective Reynolds testified that during his investigation, he viewed the video surveillance footage at the Marathon gas stations. He also stated that none of the managers at the gas station could reliably make copies of the video surveillance. As such, he asked the managers to save copies of the video onto a thumb drive. Next, he made copies of the video surveillance on his phone by taking a video of the surveillance footage directly from the computer monitor screen. Detective Reynolds testified that he sent both videos to his office email, but for some reason he was not able to burn them into CD format, so they remained in his computer. Further, Detective Reynolds stated that approximately 2-3 months before trial, he was promoted and had to move his office at that time. He deleted some files from his computer and the video footage from both gas stations got deleted in the process. During trial, Detective Reynolds testified as to what he had seen in the videos.

Hurst now argues that Detective Reynolds' testimony of the video surveillance was not the best evidence as stated by Indiana Evidence Rule 1002 and that the State should have presented the original video. First, we note that Hurst failed to make any objection when Detective Reynolds testified about the video surveillance. Failure to object at trial to the admission of evidence results in waiver of that issue on appeal. *Kubsch v. State*, 784 N.E.2d 905, 923 (Ind. 2003).

Waiver notwithstanding, we address the merits of Hurst's claim. Evid. R 1002 provides in relevant part that:

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute.

However, if the original is lost or destroyed, Evid.R. 1004 states that:

> Secondary evidence maybe admissible to prove the contents of a [] recording[] if the proponent of the secondary evidence makes a satisfactory showing to the trial court that the original item is lost or destroyed, unless the proponent lost or destroyed them in bad faith.

In this case, Detective Reynolds testified at trial that he had deleted the videos from his computer by mistake when he was moving to his new office. The record reflects that it was a mistake not driven by malice. Thus the admission of his testimony fits the best evidence rule under these circumstances.

Further, even if wrongly admitted, this amounted to a harmless error because it did not prejudice Hurst's substantial rights. *Bonner v. State,* 650 N.E.2d 1139, 1141 (Ind. 1995). In *Bonner*, the Court held that the improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt sufficient to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Id*. Here, both Waite and Foley testified to the events of the evening. The testimony comported with what the recordings allegedly showed. Based on the forgoing, we conclude that the trial court did not abuse its discretion when it admitted Detective Reynolds' testimony.

## D. *Hurst's Photograph*

Lastly, Hurst contends that the trial court abused its discretion when it admitted testimony from Detective Reynolds, indicating that he showed Waite a single photo of Hurst to identify him. Specifically, Hurst argues that:

> Certainly, showing just one (1) photograph would cause that particular suspect to stand out, as after the Detective showed Waite just one (1) picture and asked if that was the guy, Waite implicated Hurst in the crimes…The supposed photo array, which in actuality was only one (1) photo of Hurst, was impermissibly suggestive and conducive to mistaken [sic] identification considering the totality of the circumstances.

(Hurst's Br. p. 12).

Initially, we note that Hurst failed to make an objection when Detective Reynolds was testifying about the photograph. It is well settled that failure to object at trial on the admission of evidence results in waiver of that issue on appeal. *Kubsch*, 784 N.E.2d at 923.

Waiver notwithstanding, we will address the merits of Hurst's claim. Our supreme court stated that a photographic array is impermissibly suggestive if it raises a substantial likelihood of misidentification given the totality of the circumstances. *Parker v. State,* 698 N.E.2d 737, 740 (Ind.1998). The record shows that the State never elicited testimony from Detective Reynolds that he used the photo to ask Waite to identify Hurst. Rather, on cross examination, Hurst himself elicited this testimony. The State relied on Waite's testimony at trial to identify Hurst. The record further reflects that Detective Reynolds only used the photograph to confirm with Waite what he already knew and what he had seen in the surveillance videos. Therefore, the

photograph was used for confirmation of other evidence already gathered in the investigation and not for identification purposes. We find no error here and we affirm the trial court's decision.

## CONCLUSION

For the foregoing reasons, we find the following: (1) the trial court did not abuse its discretion in admitting Hurt's prior conviction; (2) the trial court did not abuse its discretion in admitting Detective Reynolds' testimony of the surveillance video; and (3) the trial court did not abuse its discretion by allowing Detective Reynolds to give testimony that Waite had identified Hurst from a single photo.

KIRSCH, J. and VAIDIK, J. concur