

FILED

May 03 2019, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James C. Spencer
Dattilo Law Office
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark E. Thevenot,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | May 3, 2019<br><br>Court of Appeals Case No.<br>18A-CR-546<br><br>Appeal from the Jefferson Circuit Court<br><br>The Honorable Darrell M. Auxier, Judge<br><br>Trial Court Cause No.<br>39C01-1612-F3-1156 |

**May, Judge.**

[1] Mark E. Thevenot appeals his convictions of Level 5 felony domestic battery[1] and Level 6 felony criminal confinement.[2] Thevenot alleges the trial court abused its discretion in the admission of evidence and erred by allowing the prosecutor to discuss case law in closing argument. We affirm.

## Facts and Procedural History

[2] In December 2016, Thevenot lived with M.B. in a two-bedroom house in Deputy, Indiana. On December 22, 2016, Thevenot and M.B. consumed numerous alcoholic beverages, and then Thevenot when to bed to sleep. M.B. wanted Thevenot to get up and talk to her, so she pulled the covers from him and started "joking around and cutting up." (Tr. Vol. 2 at 51.) Thevenot "got madder than a hornet" and jumped up out of the bed. (*Id.*) M.B. tried to leave the room, but Thevenot got into her face and began cursing at her. Thevenot, who "had that demon look[,]" (*id.* at 52), pushed M.B. and she fell down. M.B. stood back up and attempted to walk out of the house, but Thevenot pursued her, "turned [her] around and slammed [her] into" a glass-topped coffee table. (*Id.*) The coffee table glass shattered and cut M.B.'s back, which felt like it was "on fire." (*Id.* at 56.) M.B. was crying and begged Thevenot to help her get up from the floor. After helping her up, Thevenot went back to bed. M.B. went to the bathroom to assess the injury to her back and found she "had two great big

---

[1] Ind. Code § 35-42-2-1.3(a)(1).

[2] Ind. Code § 35-42-3-3(a).

old gashes in her back and needed to go to the hospital to get stitches," (*id.* at 58), but Thevenot refused to take her because he would "get 40 years in prison for it." (*Id.* at 64.) M.B. eventually fell asleep in the bed and, when she woke, the sheet was stuck to her back by dried blood.

[3] On December 23, 2016, Thevenot took M.B. to a Chinese restaurant in North Vernon because "he thought if he did something good it would make up for what he had [done] to me the night before." (*Id.* at 70.) After eating, Thevenot went to a store to obtain peroxide, Neosporin, and gauze. The couple drove home, and Thevenot cleaned and bandaged the deepest of the two cuts on M.B.'s back.

[4] On December 24, 2016, M.B. cleaned around the house, and then Thevenot drove the couple to a liquor store in North Vernon. M.B. remained in the car, and Thevenot purchased a 30-pack of beer and a fifth of whiskey. When they returned home, the couple drank beer and played Yahtzee. Later in the evening, Thevenot was talking on the telephone with family, and M.B. went to bed. M.B. was asleep when Thevenot removed her sleep apnea mask to wake her up. He told M.B. to get out of bed and drink with him because she had not let him sleep the night she pulled the covers off him.

[5] M.B. got out of bed, and Thevenot instructed her to bring them both a beer. She brought the beers to the couch and sat down with Thevenot, who was drunk and being very loud. M.B. asked Thevenot why he was yelling when she was next to him, and he "just snapped[.]" (*Id.* at 82.) Thevenot asked M.B.

why she had come back into his life, and he started punching M.B. in the head, cursing at her, calling her names, and choking her. Thevenot ripped the jacket M.B. was wearing into two pieces, tearing out part of her hair in the process. M.B. slipped away from Thevenot and ran into the kitchen. Thevenot followed her and pushed her down onto a wooden chair with sufficient force to break the chair. M.B. landed on the floor, and potted plants fell from a shelf onto M.B. and the floor. The impact rendered M.B. unable to feel her legs, and as she tried to lift herself off the floor using the cabinet door for support, Thevenot told her: "'You break that cabinet door and I'm going to give you another beating.'" (*Id*. at 91.) M.B. released the cabinet door as Thevenot left the room.

[6] A few minutes later, M.B. was able to get herself off the floor using the table for leverage, and she stood at the sink trying to compose herself and allow her legs to recover. Thevenot returned to the kitchen, and M.B. attempted to leave the room, but Thevenot "slam[med]" her into another wooden chair, (*id*. at 92), which also broke, causing M.B. to again fall to the floor. As M.B. crawled on the floor, Thevenot kicked her repeatedly, grabbed a piece of wood from a broken chair, and began beating M.B. with it, telling her he was beating her because she "throwed [sic] him in jail for six months, so he was going to beat six months[.]" (*Id*.) Thevenot hit her at least ten times as he was also kicking her. M.B.'s pain was "[e]xcruciating. I mean really bad. I mean I couldn't hardly walk by the time he got done." (*Id*. at 101.) Thevenot left M.B. on the kitchen floor and "went to bed like nothing ever happened." (*Id*. at 102.) M.B. eventually made it to the bathroom and found she had bruises all over her arms,

legs, and back, and the cuts on her back from the glass table had opened again. She asked Thevenot to take her to the hospital, but he refused.

[7] Thevenot slept most of December 25, 2016. While he was asleep, M.B. snuck his telephone and called her sister to tell her what had happened. M.B. asked her sister to call the police in two days and ask them to do a welfare check on M.B. if M.B. had not spoken to her sister again because Thevenot had threatened to kill her and throw her body in the cellar.

[8] On December 27, 2016, M.B.'s sister called police and asked them to do a welfare check on M.B. Thevenot and M.B. were in the kitchen when police knocked on the door, and Thevenot told M.B. to stay in the kitchen. When Thevenot answered the door, police inquired about M.B. because her sister in Kentucky was worried about her. Thevenot reported that M.B. had walked to Scottsburg and was not home. M.B. snuck from the kitchen to behind Thevenot and began waiving her arms so the police officer would see her. The officer asked M.B. who she was, and M.B. gave her name. The officer told M.B. that she needed to call her sister and then asked Thevenot to step outside for a minute. Thevenot refused, so the officer asked M.B. to step outside. M.B. walked toward the door to step outside, but Thevenot grabbed her, pulled her away from the door, slammed the door shut, and locked it.

[9] For the next four hours, while police and SWAT waited outside the house, Thevenot would not let M.B. out of his sight, even when she went to the bathroom. He accused M.B. of calling the police and hid his cell phone so she

could not make any more calls. Thevenot kept the lights off and the blinds shut, and he would not respond to police as they called to him with a bullhorn. When police called Thevenot's phone, he offered it to M.B. to talk to the police, but M.B. refused the phone

> because I was scared you know. He had the door locked. The back one was all the way to the back of the house. All I could do was imagine him if I got up toward that door he was going to grab me by my hair because my hair was a little longer then. That's what he was going to do, and I mean he was going to finish what he started.

(*Id*. at 128.) After over four hours of stand-off, Thevenot left the house and was taken into police custody. M.B. walked out of the house, and an officer escorted her to a chair, helped her remove her jacket to assess her injuries, and immediately called for an ambulance.

[10] The State charged Thevenot with Level 3 felony criminal confinement,[3] Level 5 felony domestic battery, Class A misdemeanor domestic battery,[4] and Level 6 felony strangulation.[5] The State also filed an allegation that Thevenot was a habitual offender. Before trial, the State moved for, and the court granted, dismissal without prejudice of the charge of Level 6 felony strangulation.

---

[3] Ind. Code § 35-42-3-3(b)(2)(B).

[4] Ind. Code § 35-42-2-1.3(c)(4).

[5] Ind. Code § 35-42-2-9(b)(1).

[11] The State filed notice of intent to offer Evidence Rule 404(b) evidence to demonstrate motive and relationship. The 404(b) evidence was explanation of Thevenot's prior conviction for battery of M.B., based on Thevenot's statement he would beat her six months because she "threw him in jail for six months." (Tr. Vol. 2 at 92.) The State also filed notice of intent to offer Evidence Rule 702 expert opinion evidence regarding domestic violence. Thevenot filed a motion in limine to exclude those two kinds of evidence. The court ruled the State could admit the 404(b) evidence of Thevenot's prior conviction as relevant to motive and could admit the 702 evidence only if Thevenot asserted M.B.'s behavior was "unexpected" for someone who was being confined. (App. Vol. 4 at 45.) As we will discuss in more detail below, both of those forms of evidence were admitted at trial.

[12] The jury found Thevenot guilty of Level 6 felony criminal confinement, Level 5 felony domestic battery, and Class A misdemeanor domestic battery. Thevenot admitted the prior convictions that demonstrated his being a habitual offender. Prior to sentencing, the trial court merged the misdemeanor and felony findings of domestic battery, to avoid a double jeopardy violation. The court imposed a five-year sentence for Level 5 felony domestic battery and enhanced that sentence by five years for the habitual offender adjudication. The court imposed a two-year sentence for Level 6 felony criminal confinement and ordered it served concurrent to the sentence for domestic battery.

# Discussion and Decision

## Admission of Evidence

If an evidentiary ruling does not raise any issues of law, "we review for an abuse of discretion." *Fairbanks v. State*, 119 N.E.3d 564, 567 (Ind. 2019). We reverse for an abuse of discretion "only when the admission is clearly against the logic and effect of the facts and circumstances" before the trial court. *Id*. at 568.

### *Prior Battery Evidence*

Thevenot first challenges the admission of evidence that he had a prior conviction of battering M.B. He asserts the evidence was inadmissible under Indiana Evidence Rule 404(b).

> Indiana Evidence Rule 404(b) serves to safeguard the presumption of innocence in favor of criminal defendants. The Rule's mandate is clear: a court may not admit evidence of another crime, wrong, or act "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Ind. Evidence Rule 404(b)(1). This restriction prevents the jury from indulging in the "forbidden inference" that a criminal defendant's "prior wrongful conduct suggests present guilt."

> But Rule 404(b) does not totally proscribe other-bad-acts evidence—only its use as character evidence. Indeed, the Rule plainly states that other-bad-acts evidence may be admissible for other purposes, and it provides an illustrative list—to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R.

404(b)(2). So when the State claims that other-bad-acts evidence is admissible for a proper purpose, the trial court is tasked with deciding whether that evidence "is relevant to a matter at issue other than the defendant's propensity to commit the charged act."

If the evidence passes that relevance test, it has to clear a second hurdle: Indiana Evidence Rule 403's balancing test. In applying Rule 403, the trial court must conclude that the evidence's probative value is not "substantially outweighed" by the danger of unfair prejudice, Evid. R. 403—otherwise, the evidence is not admissible.

*Id.* (internal case citations omitted).

[15] In this case, the State's need to produce evidence of Thevenot's past conviction for battery of M.B. arose because Thevenot, as he was beating M.B. with a piece of wood from a broken chair, announced M.B. was getting the beating because she "throwed [sic] him in jail for six months, so he was going to beat six months[.]" (Tr. Vol. 2 at 92.) This was the motive that Thevenot himself provided as he committed the crime. Because motive is an exception to Rule 404(b)'s prohibition of admitting evidence of prior crimes, we cannot say the trial court abused its discretion in determining this evidence was admissible for a proper purpose. *See*, *e.g.*, *Iqbal v. State*, 805 N.E.2d 401, 408 (Ind. Ct. App. 2004) (defendant need not advance contrary claim of motive before evidence of prior bad acts become relevant, and thus meet first hurdle for admission, as to motive for alleged crime).

[16]     Nor can we say the trial court abused its discretion in determining the evidence also cleared the Evidence Rule 403 hurdle, despite the five years that passed between the first and second trials, in light of the fact that Thevenot referenced the prior conviction as he was beating M.B. The admission of the prior conviction is being used by the State to shed light on what motivated Thevenot to commit the current crime. It is not being used to shine a negative light on Thevenot's character. Accordingly, the trial court did not abuse its discretion in admitting this evidence. *See id*. at 409.

### *Domestic Violence Expert*

[17]     Prior to trial, the State filed a notice of intent to offer expert opinion to educate the jury on domestic violence. Thevenot filed a motion in limine to prevent the introduction of such testimony. The trial court ruled:

> 1.     The State of Indiana requests the right to introduce syndrome evidence as to the victims of domestic violence.
>
> 2.     Such evidence may be used to show unexpected behavior patterns if the defense discusses or presents evidence of such unexpected behavior. In such case evidence of the prevalence of the specific unexpected behavior within the general class of reported domestic violence victims may be introduced.
>
> 3.     Such evidence shall be admissible in rebuttal if the Defendant opens the door as set forth in Paragraph 2. The State shall notify the Court in the event it intends to introduce such evidence in rebuttal.

(App. Vol. 4 at 45.) In his opening statement at trial, Thevenot noted "many aspects of [M.B.]'s conduct were inconsistent with the charges of confinement." (Appellant's Br. at 18.)[6] The State called a domestic violence expert, Laura Berry of the Indiana Coalition Against Domestic Violence, and the trial court permitted her to testify over Thevenot's objection.

[18] Thevenot argues on appeal that the admission of Berry's testimony was an abuse of discretion because M.B. had already testified to why she behaved in the way she did. For example, on direct examination, M.B was asked to explain why she did not leave the house after the coffee table incident on December 22. She explained:

> Well, for one thing my vehicle was not running. And uh –
> Another thing, where was I going? It was cold outside. It was
> nighttime. I mean I had no family here, nobody to run to, so I
> mean I was pretty much trapped there – pretty much.

(Tr. Vol. 2 at 67.) In addition, the prosecutor asked M.B. why she did not request help when Thevenot left her alone in the Chinese restaurant, and she explained:

> I wasn't in the right state of mind for one thing. I think I was still
> initially in shock, of course, between what had happened, the
> pain that was in my back because it wasn't lightly – believe me.

---

[6] We cite the Appellant's Brief, rather than the Transcript, because Thevenot has not provided a record citation for that assertion. We will not search the record to find material for the parties. *Thomas v. State*, 965 N.E.2d 70, 77 n.2 (Ind. Ct. App. 2012), *trans. denied*. Nevertheless, as Thevenot makes this admission against his interest in his brief, we presume it is correct.

> If I would have had – I thought if I would have went to
> somebody in a situation of that nature some people did not want
> to get involved. . . . I was just so scared. I know that. And I was
> afraid the cops would come and they would – he would come
> back and seen them and then it would have been worse for me
> when I got home or he would have dragged me in the car or – I
> had a thousand things running through my mind. I really did,
> and I mean I was scared you know to ask anybody for help.

(*Id*. at 76-77.)

[19] Under our evidence rules, a witness can be qualified as an expert based on "knowledge, skill, experience, training, or education." Ind. Evid. Rule 702(a). Once so qualified, the expert "may testify in the form of an opinion or otherwise . . . if the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." *Id*. To be admissible, an expert's testimony must meet that standard, must rest upon reliable scientific principles, and must not be more prejudicial than probative. *Iqbal*, 805 N.E.2d at 409.

[20] Expert testimony about "battered woman's syndrome" is admissible at trial if it is relevant to a question at issue. *Id*. For example, in *Iqbal*, the State offered expert testimony on domestic violence to explain why the victim would have allowed the defendant into her home even though he had already assaulted her and she had already gotten a protective order. *Id*. That expert "merely educated the jury on the complexity of behavior of domestic violence victims." *Id*. at 410. Moreover, because the expert had not counseled the victim and had no knowledge of the facts of the case, the expert could not cross the line into

"impermissible vouching." *Id.* Based thereon, we held the trial court had not abused its discretion in permitting the expert testimony. *Id.*

[21]  Herein, the State's expert testified she knew nothing about the facts of Thevenot's case, she did not know M.B. or Thevenot, and she was not offering an opinion about the facts of the case. She then testified generally about the dynamics of domestic violence, including economic abuse, emotional abuse, psychological abuse, denying, minimizing, and blaming. She discussed why victims frequently return to relationships with an abuser, and she testified that nearly all of the 300 victims she had assisted returned to their abuser. As in *Iqbal*, under these circumstances, we cannot say the court abused its discretion when there was no chance the expert could be seen as vouching for the victim. *See id.* (finding no abuse of discretion in expert's testimony).

## State's Closing Argument

[22]  Finally, Thevenot argues prejudicial error occurred during the State's closing argument because "the deputy prosecutor quoted from <u>Brown v. State</u>, 497 N.E.2d 1049 (Ind. 1986) on the issue of the meaning of 'substantially interfere.'" (Appellant's Br. at 21) (formatting in original). In support of his argument, Thevenot sets out the standard of review for prosecutorial misconduct and alleges it "is prosecutor misconduct to instruct the jury in closing argument on a legal issue that has not been tendered as a prospective instruction or previously considered by the Court to give to the jury." (*Id.* at 22.)

[23] However, during closing argument, Thevenot objected to the prosecutor quoting from case law. (*See* Tr. Vol. 3 at 116-120.) All counsel approached the bench to discuss the issue. The State provided sources supporting its ability to read case law to the jury. After reviewing the law provided by the State, the trial court ruled the prosecutor could discuss the case and entered a continuing objection for Thevenot. In this circumstance, when the prosecutor presented case law during closing argument with the trial court's permission, we review whether the trial court abused its discretion by allowing the prosecutor to so argue.

[24] "The proper scope of closing argument is within the trial court's sound discretion." *Walls v. State*, 993 N.E.2d 262, 269 (Ind. Ct. App. 2013), *trans. denied*. An abuse of discretion will not be found unless the trial court's decision was "clearly against the logic and effect of the facts and circumstances before it." *Id*. To obtain reversal of a conviction, an appellant must demonstrate trial court error and "resulting prejudice to his or her rights." *Id*.

[25] In closing argument, a "prosecutor may argue both law and facts and propound conclusions based upon his or her analysis of the evidence." *Lambert v. State*, 743 N.E.2d 719, 734 (Ind. 2001), *reh'g denied*, *cert. denied* 534 U.S. 1136 (2002). "[T]he reading of 'law' to a jury is permissible." *Lax v. State*, 275 Ind. 34, 38, 414 N.E.2d 555, 557 (1981). Moreover, "reading from decisions to the jury is proper in final argument so long as it is clear that the prosecutor is reading from or referring to a separate case, so as to not mislead or confuse the jury." *Hernandez v. State*, 439 N.E.2d 625, 630 (Ind. 1982).

Here, the prosecutor provided citation to the jury of *Brown v. State*, 497 N.E.2d 1049 (Ind. 1986), and told the jury: "the Court stated that the fact that the victim later freed herself does not negate the fact that the jury could find beyond a reasonable doubt that a confinement took place." (Tr. Vol. 3 at 118.) Thevenot does not assert that statement is incorrect law or a misstatement of *Brown*. The prosecutor made it clear she was reading from *Brown*, and then she discussed M.B.'s testimony about the times she wanted to escape the situation with Thevenot, but she was unable to leave.[7] We cannot say the trial court abused its discretion in allowing the prosecutor to read that sentence from caselaw during its closing argument. *See Harrison v. State*, 32 N.E.3d 240, 256 (Ind. Ct. App. 2015) (holding trial court did not abuse its discretion in allowing prosecutor to read from caselaw during closing argument), *trans. denied*.

# Conclusion

The trial court did not abuse its discretion in admitting evidence or by permitting the prosecutor to quote caselaw during closing argument. Accordingly, we affirm.

Affirmed.

---

[7] For example, M.B. testified she was headed for the front door on December 22 and wanted to leave, when Thevenot grabbed her and threw her onto the glass top table, and she was headed out the front door on December 27 when Thevenot pulled her back in the house and slammed the door shut. M.B. also testified that, during the three hours that police were outside the house on December 27, Thevenot did not let her out of his sight and she was terrified what he would do to her if she tried to leave the house. Thus, we reject Thevenot's argument that there was a "lack of evidence of confinement[.]" (Br. of Appellant at 22.)

Baker, J., and Tavitas, J., concur.