**Christopher R. EMBRY, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 30A04–0906–CR–346.

Court of Appeals of Indiana.

March 8, 2010.

Transfer Denied April 29, 2010.

**2**

Stephen Gerald Gray, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Christopher Embry appeals his conviction for Class D felony domestic battery. Embry was accused of beating his ex-wife. His theory at trial was that he acted in self-defense. When the victim took the stand, the defense impeached her by eliciting evidence of her animosity toward Embry. The State then offered evidence of five prior acts of violence that Embry allegedly committed against the witness in order to explain her hostility. Embry argues that the trial court erred by admitting this evidence in violation of Evidence Rule 404(b). We hold that, where the defense impeaches a State's witness by exposing her bias against the defendant, the State may not offer evidence of prior misconduct committed by the defendant against the witness solely to explain the witness's disposition. However, we conclude that Embry's uncharged misconduct was admissible to prove motive and negate his self-defense claim. We affirm.

### Facts and Procedural History

Christopher and Miki Embry were divorced and shared joint custody of their two daughters. On April 22, 2008, Embry had court-scheduled visitation with the children. That afternoon he drove them back to Miki's house to drop them off. Miki was hosting a party in her backyard. She had several people over, including boyfriend Greg Goodwin and neighbors Michelle Gregory and Christian Reger. Reger's two children Timothy and Hattie were also at the house playing.

Embry pulled his truck into Miki's alley. He and his daughters exited the vehicle. Embry then stood near his truck, staring at Miki. Miki was walking around the backyard. Michelle Gregory noticed Embry and asked if he needed something.

Embry responded, "I need a coat." Tr. p. 42. Embry was referring to a pink coat that belonged to one of his daughters. The coat was inside the house on the dining room table. Miki told Embry that she was not going to get it. Miki went into the house to get a beer and then came back out to talk to the kids.

Michelle Gregory asked Embry if he really needed the coat that day. Miki told Michelle Gregory, "Just leave him alone and he will leave." *Id.* at 176. Miki said she was not going into the house to get the coat. Embry said, "Well, you just went in." *Id.* at 264. Miki said, "[Y]eah, I know I did." *Id.*

Embry continued to stand still but soon began heading toward the backdoor of Miki's home. Miki said, "Don't you dare go in my f**king house!" *Id.* at 265. Miki made a dash for the door. She and Embry got there at approximately the same time. According to Miki and Michelle Gregory, Embry shoved Miki as he went in. Miki spun around in a circle and landed on her back on the floor. Goodwin was in the house by this time and saw Embry throw Miki to the ground. From outside Michelle Gregory could hear chairs fall over, a bottle hit the floor, as well as scuffling and yelling. Reger and Timothy also heard commotion. Timothy heard Miki yell, "Stop it! Get out of here!" *Id.* at 181. Embry stood up, grabbed the pink coat, and opened the door to leave.

Miki then "super leaped off the floor and jumped on his back" at the threshold. *Id.* at 268. She said, "You're not going to do this again," or "You're not going to get away [with] this." *Id.* at 132. Embry stumbled off the porch and flung Miki onto the gravel driveway. He fell on her and hit her in the face. Michelle Gregory walked behind Embry and socked him in the head with a cordless phone. Goodwin soon joined the melee and punched Embry

in the back of the head as well. At some point Embry cocked his arm back and struck Miki in her left eye.

Goodwin attempted to get Embry in a bear hug. Two neighbors came by and helped remove Miki from the brawl. Embry withdrew from the fight, sat for a minute, and then got into his truck. As he backed out, the police arrived.

The State charged Embry with Class D felony domestic battery in the presence of a child, Class D felony residential entry, Class A misdemeanor domestic battery, and Class A misdemeanor criminal trespass.

The State filed a "404(b) notice" claiming that it would "seek to offer at trial, if otherwise admissible under the Indiana Rules, evidence pertaining to the following convictions and/or events: History of domestic violence incidents as to [Miki] Embry, during the marriage, after the separation, and post-dissolution." Appellant's App. p. 32.

Embry responded by filing a motion in limine to exclude his prior uncharged misconduct. He sought to exclude any evidence that he confined and assaulted Miki in 2003; that he beat, confined, and threatened her in September 2005; that he beat her again in October 2005; that he "shoved" her in spring 2006; that he threw medical bills in her face in February 2007; and that he "made 'punching' movements" in her direction in fall 2007. *Id.* at 29–30. Embry argued that these acts were inadmissible under Evidence Rules 404(b) and 403. The trial court granted Embry's motion.

The State called Miki to testify at trial. On cross-examination, the defense questioned her about a number of derogatory statements she had posted about Embry on her MySpace blog prior to the incident in question:

BY [DEFENSE]: . . . Prior to Au–April 22nd, 2008 had you ever expressed or communicated in any way that you wanted your ex to die a slow painful death?

A I believe you're referring to my "My Space" . . .

Q I'm not—I—no, I'm not referring to anything. I'm just asking you a simple question: if you'd ever expressed or communicated in any way that you wanted your ex-husband, Mr. Embry, to die a slow painful death?

A I see it right there on your desk.

Q Okay.

A It's my "My Space" blog.

Q Okay, did you say it?

A I typed it.

Q Okay. But the answer is, did you say it? I mean is that your communication.

A I typed it.

Q Okay. And did you ever express um, or communicate in any way that you wanted to be present and dance the cha-cha around his slow painful death?

A It's all there in the blog.

Q Okay. The answer's a simple yes or no. You said it; you've communicated it some way, did you?

A If you want to put that blog there, I . . .

Q I'm just asking you a simple question.

BY COURT: Ma'am, will ya just answer the question yes or no?

A Yes, I did.

Q Did you ever refer to Mr. Embry or communicate in any way that he was a worthless bag of monkey shit?

A Yes.

Q Did you ever refer to him as dog piss?

A Yes.

Q Did you ever refer to him as a worm puke stale crusty moldy inhuman horrible human oxygen sucking moron?

A Yes.

Q Did you ever communicate the desire, that because he's older and more stupid than you, he will die way before you do?

A I believe I said please assure me that it was possible that he would pass before me.

Tr. p. 300–02.

The State then asked the trial court to revisit its in limine ruling which excluded evidence of Embry's prior misconduct. The State argued that "based upon the previous line of questioning ... Counsel has opened the door with reference to why [Miki] believes the various things...." *Id.* at 303. The State sought to introduce Embry's prior acts of violence to explain Miki's hateful statements and animosity. The trial court found that Embry had opened the door. The court permitted the State to question Miki about Embry's prior alleged instances of domestic violence:

Q Okay. Now, [defense counsel] wanted to know why you wrote the things that you did showing that you weren't very fond of Mr. Embry. It's a fair statement to say, you're not very fond of him.

BY [DEFENSE]: Well it's not a fair statement of my question. I object to it. It's a mischaracterization. I never used the word why in any of my questions. I merely asked her if she ever communicated or expressed those thoughts.

BY [STATE]: I'll rephrase.

BY COURT: Alright.

BY [STATE]: Ms. Embry, is it fair—fair to say that you're not very fond of your former husband?

A No, I am not fond of him at all.

Q Okay. Was there an incident in September of 2005 originating in your family's attic at that time that resulted in acts that you considered confinement and physical violence?

BY [DEFENSE]: I'm going to object, Your Honor, for all the reasons previously argued.

BY COURT: So noted. Objection overruled.

A Yes Ma'am.

Q Was that incident [of] confinement physical violence perpetrated by your former husband, Mr. Embry?

A Yes.

BY [DEFENSE]: And, Your Honor, will you show my objection to this entire line of questioning that's continuing where I don't have to continue to interrupt?

BY COURT: I will.

BY [DEFENSE]: Thank you.

BY [STATE]: Was there an incident that you considered an act of physical violence that occurred on or about October 31st of 2005?

A Halloween Day, yes.

Q Was that an act of physical violence by Mr. Embry?

A Yes.

Q Was there an incident that occurred in the Spring of 2006?

A Yes, that's when he pushed me.

Q Is that Mr. Embry?

A Yes.

Q And if I could have you stick just specifically yeses and nos—...

A I'm sorry, yes.

Q ... and (inaudible) the like. Was there an incident in February of 2007?

A Super Bowl Sunday, yes.

Q Did you consider that an act of domestic violence?

A It was scary, yes.

Q Was that an act by Mr. Embry against you?

A Yes Ma'am.

Q Was there an incident in the Autumn of 2007 that you consider an act of domestic violence by Mr. Embry on you?

A Yes Ma'am.

*Id.* at 318–20. The trial court provided a limiting instruction to the jury on the relevance of Embry's prior misconduct:

BY COURT: ... Ladies and Gentlemen of the Jury uh, several questions were asked by the Prosecutor concerning this Witnesses' [sic] remarks in I believe it was My Space?

BY [STATE]: Yes.

BY COURT: Or Face Book?

BY [STATE]: My Space.

BY COURT: On My Space in segments [sic] that were made concerning the Defendant in this cause. You are to understand that these statements by the Witness were not uh, admitted to prove an [sic] character or to show any action in conformity with the prior acts, but only show why she made the particular remarks. . . .

*Id.* at 322–23.

Embry's theory at trial was that he was acting in self-defense. Defense counsel argued in part that "[t]he assault began when [Miki] jumped on his back." *Id.* at 391. The State responded that Embry "never had a right of self defense. He was in the wrong from the start." *Id.* at 392.

The trial court gave the following self-defense instruction to the jury:

A person may use reasonable force against another person to protect themselves [sic] from what he reasonably believes to be the eminent [sic] use of unlawful force. No person in this State should be placed in legal jeopardy of any kind whatsoever to protect himself or his family by reasonable means necessary. However, a person may not use force if: 1) he is committing a crime that is directly and immediately connected to the confrontation; 2) he has provoked unlawful action by another person with the intent to cause bodily injury to another person; or 3) he would [sic] willingly entered into a fight with another person or started the fight. Unless he or she withdraws from the fight and communicates to the other person his intent to withdraw, then the other person never the less continues to threaten to continue the fight. The State has the burden to—of proving beyond a reasonable doubt that the Defendant did not act in his self defense. When a person has used more force than is necessary to repel an attack, the right of self defense is extinguished and the ultimate result is that the intended victim then becomes the perpetrator.

*Id.* at 403–04.

The jury found Embry guilty of Class A misdemeanor domestic battery and Class D felony domestic battery in the presence of a child. The trial court merged the convictions and entered judgment on the Class D felony. Embry now appeals.

### Discussion and Decision

Embry argues that the trial court erred by admitting evidence of his prior acts of violence against Miki. The State contends that the evidence was admissible either (I) to rehabilitate Miki's credibility on redirect or (II) to prove Embry's motive for com-

mitting the crimes charged. The admission and exclusion of evidence lies within the sound discretion of the trial court. *State v. Lloyd,* 800 N.E.2d 196, 198 (Ind. Ct.App.2003). We therefore review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Payne v. State,* 854 N.E.2d 7, 13 (Ind.Ct.App.2006), *trans. denied.* An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.*

## I. Use of Uncharged Misconduct for Witness Rehabilitation

██ The State maintains that Embry opened the door to his uncharged misconduct by exposing Miki's animosity toward him on cross-examination. The State argues that the defense "made clear that Miki harbored hateful feelings toward Embry, and this was relevant evidence to be sure of her possible bias against him. However, because Embry was able to explore *how* or *what* Miki felt towards Embry, the State was perfectly right to believe that it could, in turn, explore *why* she felt towards Embry, as she did." Appellee's Br. p. 9.

The Indiana Evidence Rules provide that the credibility of a witness may be attacked by any party. Ind. Evidence Rule 607; *Ingram v. State,* 715 N.E.2d 405, 407 (Ind.1999). For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible. Ind. Evidence Rule 616; *Ingram,* 715 N.E.2d at 407.

██ By the same token, "[a] witness may be rehabilitated on redirect examination if he was discredited by his testimony on cross-examination." 6 Terrance L. Smith & Adrian P. Smith, *Indiana Practice: Trial Handbook for Indiana Lawyers* § 24:4 (2009). "[W]hen there has been evidence of impeaching facts, the wit-

ness's proponent may present contradictory evidence disproving the alleged impeaching facts." 1 Kenneth S. Broun, et al., *McCormick on Evidence* § 47 (6th ed. 2006).

██ Courts recognize two general rules respecting witness rehabilitation:

The first rule is that evidence supporting credibility is admissible only if credibility has been or certainly will be attacked. This is based on the conclusion that, without such an attack, evidence supporting credibility is of insufficient probative value to warrant the time necessary to consider it. . . .

The second principle is that, even if credibility is attacked, evidence supporting credibility is admissible only if it logically refutes the specific focus of the attack. . . .

The second principle is the more difficult one to apply. Its application requires determining what logically will refute the attack on credibility. The answer usually varies depending on the basis for that attack. . . .

An attack on credibility based on witness bias may be met by evidence disputing the existence of the bias, the effect of the bias, or the facts that allegedly give rise to the inference of bias.

27 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6098 (2d ed. 2007) (footnotes omitted).

██ "Evidence offered to explain or justify an admitted bias does not logically refute the effect of bias on credibility. As a consequence this evidence is irrelevant, at least to rehabilitate." *Id.* (footnote omitted). Wigmore further explains that when hostility is imputed to a witness,

the true process of explanation consists in showing that the facts offered do not really indicate the conclusion suggested,

i.e., the hostility. Thus, when the counterevidence does not attempt to do this, but admits the hostility and desires to show that it was *justifiable by the opponent's conduct,* the offer is improper in two ways, first, because it does not at all explain away, but concedes that hostility exists, and, secondly, because it tends to prejudice unfairly the cause of the opponent by showing him to be an unjust man.

IIIA John Henry Wigmore, *Evidence in Trials at Common Law* § 952 (James H. Chadbourn ed., 1970).

To be sure, some jurisdictions have nonetheless held that if the defense elicits bias on the part of a State's witness, the State may respond by introducing the defendant's prior uncharged misconduct to explain the witness's antipathy. *See, e.g., United States v. Austin,* 774 F.2d 99, 102 (5th Cir.1985) (after defense elicited evidence of hostility between witness and defendant, prosecution could inquire about defendant's violence toward witness as "legitimate effort to rehabilitate her credibility"); *Hall v. State,* 11 Ark.App. 53, 666 S.W.2d 408, 408–09 (1984) (prior misconduct was admissible to explain witness's hard feelings toward the defendant). *See generally* 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 6:23 (2005) ("Some courts permit the prosecutor on redirect to invite the witness to explain that he or she dislikes the defendant because of the defendant's crimes against the witness.").

■ We respectfully part from those jurisdictions, however, and believe that use of uncharged misconduct in this manner belies the rules and purposes of witness rehabilitation discussed above. Offering the defendant's prior bad acts to explain a witness's animosity only reinforces—rather than disproves—the witness's disposition. Introduction of the defendant's uncharged misconduct thus violates the rule of logical refutation and has no rehabilitative value. Accordingly, the evidence is irrelevant and inadmissible if offered for purposes of rehabilitation.

Here the defense cross-examined Miki about several disparaging statements she made about Embry on her MySpace blog. Miki wrote that she wanted to "dance the cha-cha around his slow painful death." She referred to Embry as "dog piss," "a worthless bag of monkey shit," and "a worm puke stale crusty moldy inhuman horrible human oxygen sucking moron." The defense elicited this evidence to show Miki's hostility toward Embry, expose her bias, and attack her credibility. The State responded by offering evidence of five prior acts of violence that Embry allegedly committed against Miki. The State offered its evidence to explain or contextualize Miki's resentment. In line with the foregoing authority, we hold that the use of Embry's prior misconduct for this purpose constituted improper rehabilitation. We conclude that the trial court erred by admitting Embry's prior uncharged misconduct merely to justify Miki's animosity.

## II. Use of Uncharged Misconduct to Prove Motive and Negate Self–Defense

■ The State argues in the alternative that Embry's prior misconduct was relevant to prove his motive to commit the offenses charged in this case.

■ Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...." Evidence Rule 404(b) tracks Federal Rule of Evidence

404(b) almost verbatim. *See Hicks v. State,* 690 N.E.2d 215, 218 & n. 1 (Ind. 1997) (noting that the federal rule also includes "opportunity" in its short list of permissible purposes). The rule is designed to prevent the jury from assessing a defendant's present guilt on the basis of his propensities—the so-called "forbidden inference." *Id.* at 218–19. Prior misconduct may be admissible to prove motive, intent, or other material facts at issue in a case. *Id.* Rule 404(b)'s list of permissible purposes is illustrative but not exhaustive. *Id.*

 In assessing the admissibility of 404(b) evidence a trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Wilson v. State,* 765 N.E.2d 1265, 1270 (Ind.2002). Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

 "[P]roof of the defendant's motive to commit the charged crime lends itself to three legitimate theories of logical relevance." 1 Imwinkelried, *supra,* § 5:35 (1999). "Evidence of motive may be offered to prove that the act was committed, or to prove the identity of the actor, or to prove the requisite mental state." 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5240 (1978).

When evidence of motive is offered for those purposes, "[n]umerous cases have held that where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be admitted to show the relationship between the parties and motive for committing the crime." *Iqbal v. State,* 805 N.E.2d 401, 408 (Ind.Ct.App.2004) (citing *Hicks,* 690 N.E.2d at 222; *Haggenjos v. State,* 441 N.E.2d 430, 431 (Ind.1982)); *see also* 1 Imwinkelried, *supra,* § 4:19 (2008) ("When the uncharged acts of domestic violence are directed against the same spouse or partner alleged in the pending charge, there is little or no need to invoke character reasoning in order to justify the admission of the evidence.... [T]he trial judge can readily admit the evidence on a noncharacter motive theory; the uncharged acts evidence hostility toward the victim, and in turn that hostility may be the motive for the charged act of domestic violence.").

 Moreover, a defendant claiming self-defense goes beyond merely denying the charged culpability and advances a claim of particular contrary intent, and the State may be able to use his prior misconduct to disprove that the victim was the first aggressor. *See Evans v. State,* 727 N.E.2d 1072, 1080 (Ind.2000). In *Evans,* the defendant's ex-girlfriend was lying in bed with a new boyfriend. *Id.* at 1076. The defendant approached them with a knife and made a stabbing motion toward the ex-girlfriend. *Id.* He asked, "Is that the reason you won't take me back?" *Id.* Melee ensued between the defendant and the new boyfriend. *Id.* The fight migrated throughout the house and concluded with the defendant stabbing the boyfriend and killing him. *Id.* The defendant claimed self-defense and argued that the victim was the first aggressor. *Id.* at 1078–79. The State sought to introduce evidence that the defendant choked his ex-girlfriend two days before the incident in question after she insisted on ending their relationship. *Id.* at 1080. Our Supreme Court first noted that the defendant "went be-

yond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent-self defense...." *Id.* The Court then explained the independent relevance of the defendant's uncharged misconduct:

> First, it directly rebutted Defendant's claim that [the victim] was the dangerous aggressor and tended to show that Defendant initiated their fatal fight after he saw [the victim] in bed with [the ex-girlfriend] and asked, "Is he the reason why you won't take me back?" Second, this evidence of Defendant's prior misconduct was close enough in time (approximately 48 hours) to be genuinely relevant in showing Defendant's intent at the time of the murder. *See Hicks*, 690 N.E.2d at 220 (A trial court's discretion in admitting evidence of the defendant's prior bad acts "includes determining the significance of the similarity or remoteness of evidence.") (citing *Fisher v. State*, 641 N.E.2d 105 (Ind.Ct.App. 1994)).

*Id.; see also Goldsberry v. State*, 821 N.E.2d 447, 456 (Ind.Ct.App.2005) (evidence of defendant's prior assaults against victim were "admissible to demonstrate his motive was to batter her and not simply to defend himself").

The principal dispute in this case was whether Embry was acting in self-defense during the course of his physical confrontation with Miki. One of the sub-issues that the jury was asked to resolve was whether Embry first attacked Miki inside the residence. Miki testified that Embry shoved her as they went into the house. Goodwin testified that Embry threw Miki to the ground. Timothy, Reger, and Michelle Gregory said they heard commotion coming from inside. As the jury had to determine in part whether Embry first assailed Miki within the residence, evidence of Embry's possible motive to do so

was probative and admissible. Embry's prior acts of violence against Miki evidenced his hostility toward her, which in turn was admissible to demonstrate his motive for a violent attack, which made more probable the conclusion that he assaulted her and instigated the entire physical confrontation. Accordingly, we conclude that the prior misconduct was independently relevant and had a purpose other than to show a propensity to commit the crimes charged.

The final question is whether the uncharged misconduct's probative value was so substantially outweighed by its potential for unfair prejudice that it should have been excluded under Rule 403. We acknowledge that the danger of prejudice was tangible here, given the number of prior bad acts referenced. On the other hand, the trial court gave a limiting instruction and admonished the jury that the defendant's prior misconduct was not admitted to demonstrate character or prove action in conformity therewith. Balancing the probative value on the issue of motive against the danger of unfair misuse, we cannot say the trial court abused its discretion by admitting the prior misconduct evidence.

Affirmed.

RILEY and CRONE, JJ., concur.