# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 14 2018, 10:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch II
Boren, Oliver & Coffey, LLP
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rickey D. Haines,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 14, 2018<br><br>Court of Appeals Case No.<br>07A01-1708-CR-1994<br><br>Appeal from the<br>Brown Circuit Court<br><br>The Honorable<br>Judith A. Stewart, Judge<br><br>Trial Court Cause No.<br>07C01-1512-F1-373 |

**Kirsch, Judge.**

[1] Following a jury trial, Rickey D. Haines ("Haines") appeals his convictions for Level 3 felony criminal confinement,[1] Level 6 felony domestic battery,[2] Class A misdemeanor possession of a firearm by a domestic batterer,[3] and his adjudication as a habitual offender.[4] He raises the following restated issues:

> I. Whether the trial court abused its discretion when it admitted evidence of two prior incidents of domestic violence by Haines toward the victim;
>
> II. Whether the trial court erred when it denied Haines's motion to dismiss that was based on the State's failure to preserve the victim's cell phone after it was forensically examined by the State; and
>
> III. Whether the trial court erred when it did not grant Haines's motion to correct error concerning the habitual offender enhancement because some convictions used by the State were outside the ten-year limit imposed by statute.

[2] We affirm in part, reverse in part, and remand.

---

[1] *See* Ind. Code § 35-42-3-3(a), (b).

[2] *See* Ind. Code § 35-42-2-1.3(a), (b)(2).

[3] *See* Ind. Code § 35-47-4-6.

[4] *See* Ind. Code § 35-50-2-8(d). We note that Haines was also convicted of Level 6 felony strangulation, Indiana Code section 35-42-2-9(b), but the trial court later vacated that conviction based on double jeopardy grounds. *Appellant's App. Vol. 2* at 250.

## Facts and Procedural History

[3] As of December 2015, Haines and Jennifer Wagers ("Wagers") had been in an on-again/off-again relationship for approximately fourteen years, and they had two minor children together, J.H. and G.H. (together, "Children"). On December 8, 2015, Wagers went to Haines's residence to make dinner and pick up their Children, ages nine and five years old at the time, who would be getting off the school bus there. When Wagers arrived, she went inside to begin making dinner. At some point, Wagers went into the bathroom, and, shortly thereafter, Haines came in and closed the door behind him. Haines demanded that Wagers hand over her cell phone to him, because he wanted to search her phone for contact with another man, and the two argued. Wagers would not unlock her phone, and Haines was yelling at her. He told her to "assume the position," Wagers got on the floor on her knees, and Haines tried to drown her in the bathtub. *Tr. Vol. IV* at 168. She ended up on her stomach on the floor of the bathroom, and he had sex with her, which she testified was non-consensual. G.H. knocked on the bathroom door, and Haines told him go away. *Tr. Vol. IV* at 170-71; *Tr. Vol. V* at 52, 65. G.H. heard his mother crying and saying "stop," and he ran to summon Haines's mother ("Grandmother"), who lived nearby. *Tr. Vol. V* at 52-53. Grandmother came to Haines's residence and knocked on the closed bathroom door, and Haines opened the door. Wagers asked Grandmother to stay, but she left the residence.

[4] Eventually, Wagers escaped the bathroom and ran out of the residence, and Haines ran out another door, still arguing about the phone. Haines cornered

Wagers on the porch and would not let her down the stairs to leave. He punched her in the face with his fist. As Wagers sat on the porch, Haines put Wagers in "a choke hold," saying "good night bitch" as she struggled. *Tr. Vol. IV* at 175; *Tr. Vol. V* at 68. The Children came outside at some point, yelled at Haines "to stop," observed Haines put their mother in a choke hold, and saw him throw a bicycle at Wagers. *Tr. Vol. V* at 68. He told the Children to go back into the house. Haines ripped a metal porch rail out of the porch and threatened to hit Wagers and break her kneecap. He then swung the metal pole at Wagers, striking her on the shin, ripping her pants, lacerating her leg, and bruising her foot. Wagers agreed to unlock her phone, and Haines looked through it. He saw messages to other people and was angry, and he ordered her to go back into the residence, which she did.

[5] Inside, he made Wagers get his shotgun and give it to him, and he sent the Children to bed. He told Wagers to go to the bedroom, and he followed, bringing the shotgun and setting it in a corner. He told her to remove her pants and lay on her stomach, which she did, and he had intercourse with her, and he directed her to perform oral sex.[5] During this time, Haines told Wagers that he was recording "everything" on her phone, indicating he was going to share it on social media "to show everyone how much of a whore [she] was and how much

---

[5] Wagers testified that Haines engaged in non-consensual sexual activity with her while they were in the bathroom and again, later, after they returned inside the house from outside. *Tr. Vol. IV* at 168-70, 180-81. Haines acknowledged engaging in the sexual activity, but told police it was consensual. *Tr. Vol. V* at 135. The jury found Haines not guilty on the rape charge. *Tr. Vol. VI* at 67.

of a bad mother [she] was." *Tr. Vol. IV* at 181-182, 218, 233, 237.  Haines eventually went to sleep, but Wagers did not leave because she could not walk and was afraid he would catch her.  Sometime in the morning, Wagers regained custody of her phone, finding it on Haines's dresser, and after he left for work, Wagers called her sister, Jamie Wagers ("Jamie") and asked her to come for her.  After Wagers had left Haines's residence, she called the Brown County Sheriff's Department to report what Haines had done.

[6]     Deputy Joshua Stargell ("Deputy Stargell") arrived, and Wagers told him that she had been battered the previous night by Haines.  He observed a large laceration on her left shin, redness around her nose and neck.  She showed the officer the metal pole that Haines used to batter her; it was about four feet long and had a bolt sticking out of it.  She also told him that she was strangled and punched in the nose.  Wagers told Chief Deputy Michael Morris ("Chief Deputy Morris") that Haines had said that he was recording sex acts on her phone, so Chief Deputy Morris collected Wagers's phone as evidence.  Chief Deputy Morris arranged for the Fishers Police Department's forensic analysis lab to examine the phone, advising the Fishers Police Department about the sexual allegations that Wagers had made against Haines and her statement to deputies that Haines said he was recording sex acts.  An examiner in the Fishers forensic analysis lab conducted a forensic examination of the cell phone, and the examiner did not find any video recordings or photographs related to the case.  In the process, the examiner made and kept a digital backup of all the phone's content.  As nothing relevant was found on the phone, Chief

Deputy Morris went and retrieved the phone in Fishers. After Chief Deputy Morris was advised that the analysis "did not recover any type of evidence of the alleged assault at all," he returned the phone to Wagers, who used the phone for a period of time, but replaced it eventually when the screen broke. *Tr. Vol. V* at 134.

[7] On December 11, 2015, the State charged Haines with Level 1 felony rape, and it subsequently amended the information to add charges of Level 3 felony criminal confinement, Level 6 felony domestic battery, Level 6 felony strangulation, and Class A misdemeanor possession of a firearm by a domestic batterer. The State also alleged that Haines was a habitual offender. *Appellant's App. Vol. 2* at 4, 12-13, 31, 116, 165.

[8] In March 2016, the State filed notice of its intent to introduce evidence under Indiana Evidence Rule 404(b), specifically, evidence of: (1) a prior domestic battery conviction in which Wagers was the victim; (2) pending charged conduct of, among other things, domestic battery and criminal recklessness with a deadly weapon, in which Wagers was the victim; (3) prior uncharged acts of domestic battery against Wagers; and (4) protective orders and no contact orders granted in favor of Wagers against Haines. *Id*. at 40-41. In December 2016, Haines filed a motion in limine to exclude that evidence. *Id*. at 96-97. On February 23, 2017, the trial court issued an order, ruling that the State could admit evidence of two incidents, one in 2009 and another in 2015, both of which had resulted in criminal charges, as this evidence was relevant to motive and the relationship between the parties, but that the State could not

admit any other evidence of uncharged acts or protective orders that had been obtained. *Id.* at 109-11.

[9] In April 2016, Haines filed a motion to dismiss, in which he asserted that the charges against him should be dismissed on state and federal due process grounds because the State "negligently destroyed a cell phone belonging to the alleged victim," that the phone was material evidence, and that he was irreparably and materially prejudiced because he had no ability to examine the phone. *Id*. at 45-46. The trial court conducted a hearing on May 11, 2016 on Haines's motion to dismiss. At the hearing, the State argued that Haines's motion should be denied, for various reasons, including that evidence was not destroyed as all contents on the phone were preserved and available to both parties. The State called as a witness Detective J.D. Floyd ("Detective Floyd"), a computer forensic examiner with the Fishers Police Department. Detective Floyd stated that the Fishers Police Department has one of six forensic laboratories in the state and the Fishers lab handles cases for agencies throughout the state. He testified that his sergeant was contacted by Chief Deputy Morris, who asked the Fishers lab to perform "an extraction" on the phone. *Tr. Vol. II* at 80. Using specialized cabling and software, the examiner extracts or "reads" data, noting that they do not and cannot "write to," that is, change, the data. *Id*. at 81. Detective Floyd stated that each phone is different as far as what data can be accessed, including whether deleted information is capable of being recovered, and what is capable of extraction is also dependent on the "advancements of the software." *Id*. at 84. He said, for this particular

phone, "I was able to extract the file system, or do a back up of the phone, which allowed me to extract the logical data of the phone but not the physical data[,]" with logical data being the things that you can see when you look at the phone, whereas physical data would be a "bit for bit" copy including memory of the phone and any attached micro SD card. *Id*. He testified that the extracted information was retained and preserved on the forensic server.

[10] With regard to what he was looking for, Detective Floyd stated that he was instructed to see if there were any pictures or videos that would be relevant to the alleged offense and also to look for evidence of deleted information. He reported that he "found no items of relevance on the phone." *Id*. at 85. The physical phone was thereafter returned to the Brown County Sheriff's Department. Detective Floyd testified that, based on his experience, anything that could be extracted from the phone was extracted by him and preserved. *Id*. at 85-86. On cross-examination, Detective Floyd acknowledged that his software program was not the only program used around the country to extract data. The State also called Wagers, who testified that law enforcement returned the phone to her after examination and that it had value to her because it still had unused minutes on it. She stated that at some point after it was returned to her, the screen cracked, and she deleted everything and gave it to her father.

[11] In arguing for the trial court to grant Haines's motion to dismiss, defense counsel urged that the phone "clearly should have been expected to play a significant role in [Haines]'s defense," as the phone "may have exonerated [Haines] from the crimes with which he is charged[,]" but "because the phone

itself has been effectively destroyed" it could not be independently examined by an expert. *Id*. at 90. The State's failure to preserve the phone, Haines argued, prejudiced him. The State responded that a backup of the extracted data was preserved and remained available. The next day, the trial court issued an order denying Haines's motion to dismiss. *Appellant's App. Vol. 2* at 69-71. In it, the trial court found that the phone was "potentially useful" evidence, but was not "materially exculpatory" evidence, and, further, a digital backup copy of the phone's contents existed and was available to both parties or their experts. *Id*. Finding that there was no evidence of bad faith by the State and no grounds for dismissal of the pending charges, the trial court denied Haines's motion.

[12] A bifurcated jury trial was held on March 27 through March 30, 2017. The State called, among other witnesses, Wagers, her sister Jamie, both Children, and deputies. Wagers testified as to the events of the night in question, which began because Haines kept demanding to see the contents of her cell phone, which she described as "a generic prepaid phone." *Tr. Vol. IV* at 168. She described being yelled at, punched, sexually assaulted, strangled, hit with a metal pole, and having Haines throw a bike at her. She stated, "When he made me perform oral sex, . . . he was telling me that he was recording everything[,]" and saying, "Everyone's going to know how much of a whore you are." *Id*. at 181. When asked, "Do you know if he was recording or not?" she replied, "That's what he was telling me." *Id*. at 182, 218. She testified that she turned the phone over to law enforcement, and, after it had been examined, they returned it to her. When asked why she wanted the cell phone back, she stated,

"I'm a single mother with two kids. I had to have my phone." *Id*. at 186. She stated that she kept it and used it "for a long time[,]" but "[t]he screen ended up breaking so I had to replace it, the phone." *Id*.

[13] As is relevant to this appeal, Wagers also testified about prior acts of domestic violence against her by Haines. Haines objected, but the trial court stated that it would allow two specific acts, as they were relevant to Haines's motive. Prior to Wagers's testimony concerning prior bad acts, the trial court gave the following admonishment:

> Ladies and gentlemen, you are about to hear some evidence of acts other than those that are charged in this case. This evidence is being received only on the issue of motive and you should consider it - should be considered by you only for that limited purpose.

*Id.* at 204. Wagers then testified that in October 2009, Haines accused her of sleeping with a neighbor, and during their argument about it, Haines hit Wagers in the face and strangled her while the Children were present. He was convicted for his actions. *Id.* at 204-05. She also testified that, in June 2015, Haines pushed Wagers on the floor during an argument, and as she drove away, he fired a shotgun at her car. *Id*. at 205-07.

[14] Deputy Stargell testified to being dispatched around 11:00 a.m. on December 9, 2015 and that Wagers told him she had been battered and sexually assaulted the night before by Haines. Lieutenant Michael Moore testified that he went to the scene to assist Deputy Stargell, and he observed that Wagers was "definitely

distraught" and sometimes crying. *Id.* at 136. Nathan Tompkins, previously a detective with the Brown County Sheriff's Department, testified that he was contacted by Deputy Stargell, came to Haines's residence, and interviewed Wagers. She described sexual assaults, being punched in the face, being choked, and he observed injuries to her leg. He later interviewed the Children, separately, at their school. Pictures that authorities had taken of Wagers and her injuries were admitted into evidence.

[15] Chief Deputy Morris explained that, on the night in question, he collected Wagers's phone as evidence "because there were allegations that the phone had been used to facilitate the alleged assault in some fashion," *Tr. Vol. V* at 133, and he contacted the Fishers Police Department and asked them to analyze the phone. When asked why he ultimately returned the phone to Wagers, he explained that (1) "[T]hey did not recover any type of evidence of the alleged assault," and, therefore, Chief Deputy Morris "did not see any evidentiary value in it," and (2) Wagers seemed attached to the phone and wanted it back, and "she's a single mother, live[s] somewhat remotely, and . . . was of a very modest means, and that seemed her only mode of communicating with the [] outside world if something were to happen. I felt, you know, prudent to give her the phone back." *Id.* at 134-35. He estimated that he returned the phone to Wagers approximately one week after collecting it from her.

[16] Jamie testified that Wagers called her on the morning of December 9, 2015, stating that she needed help. Jamie said that, when she arrived, Wagers was upset, crying and in pain, and "hobbling" due to "a big gash" in her leg. *Id.* at

85. At Wagers's request, Jamie helped to gather Wagers's belongings and the Children's belongings. They followed each other back to Wagers's house and called police.

[17] Detective Floyd testified that an investigator with the Brown County Sheriff's Department contacted the Fishers Police Department to assist with a forensic examination of Wagers's cell phone; Detective Floyd noted that it was not uncommon for other departments to request forensic examination of items. He conducted a forensic examination of the phone, which was a Motorola prepaid phone. He explained the ideal process was to "make a bit for bit copy" of the device in question, which means to "take every bit of memory that it has and copy it so we can examine it forensically[,]" but depending on the manufacturer and the model, sometimes a bit for bit copy is not possible, in which case he would attempt to get "a logical copy," which is what you can see on the device. *Id.* at 94. Detective Floyd explained that some "track phones" are designed not to communicate with computers, although "this particular phone was able to communicate" with the computer. *Id.* at 95. However, Detective Floyd was not able to conduct a bit for bit examination of Wagers's phone, and instead, his department "pull[ed] all the back up data and the shared back up data off the phone." *Id.* at 96. He stated that he "did not find anything of evidentiary value" on the phone, indicating he did not find "any video that might demonstrate the allegation." *Id.* at 97. He could not testify as to whether there was a video that had been deleted from Wagers's cell phone. Detective Floyd testified that all the information obtained from the phone was preserved, and he

still had it as of the date of trial. He also testified that he gave the phone and a CD or DVD of its contents to the Brown County investigator. The computer program that Detective Floyd used to extract and copy data was called Cellebrite, and he acknowledged the possibility that some other program potentially may have been able to access other information on the phone. *Id*. at 102-03.

[18] Right before the State rested its case-in-chief, counsel for Haines renewed his motion to dismiss "based on destruction of evidence," stating "the phone should have been preserved as potential exculpatory evidence and it was not preserved." *Id.* at 179. The State argued that the phone's extracted data "is available and still stored and remains available." *Id*. at 180. After it was confirmed that the digital copy of the phone's contents still remained available, the trial court reaffirmed its denial of Haines's motion to dismiss. *Id.* at 179-90, 235-36.

[19] The jury found Haines not guilty of the rape charge and guilty of the remaining counts. Haines waived a jury trial as to the habitual offender charge, and, after a hearing, the trial court adjudicated him to be a habitual offender. On April 20, 2017, Haines filed a motion to correct error, relying on the recently-decided case of *Johnson v. State*, which held that "convictions from which the offender was released more than ten years before the current offense do not count for habitual purposes under [Ind. Code section 35-50-2-8(d)]." 75 N.E.3d 549, 552-53 (Ind. Ct. App. 2017), *trans. granted*. Haines argued that, in his case, two of the prior convictions relied upon by the State for his habitual offender

enhancement did not count under *Johnson* for habitual purposes, and he asked the trial court to vacate the habitual offender finding. *Appellant's App. Vol. 2* at 227-28. The State filed a response indicating that transfer would be sought and that the *Johnson* case had not yet been certified. The trial court took the matter under advisement.

[20] On May 1, 2017, the trial court set the motion to correct error for hearing, and it imposed a nine-year sentence on the criminal confinement conviction, enhanced by six years for the habitual offender adjudication, two and one-half years on the domestic battery conviction, and one year on the firearm possession conviction, with the sentences to run concurrently for an aggregate sentence of fifteen years. *Id.* at 19, 245-48; *Tr. Vol. VI* at 151-52. The court subsequently vacated the conviction for Level 6 felony strangulation on double jeopardy grounds. *Appellant's App. Vol. 2* at 250; *Tr. Vol. VI* at 181. In August 2017, the trial court denied Haines's motion to correct error, noting that transfer had been granted in the *Johnson* case. *Appellant's App. Vol. 2* at 21; *Appellant's App. Vol. 3* at 10. Haines now appeals.

## Discussion and Decision

## I. Evidence Rule 404(b)

[21] Haines asserts on appeal that the trial court erred when it admitted evidence of his prior bad acts, namely a prior domestic violence conviction and a pending charge of criminal recklessness, with Wagers being the victim in both. The trial court has sound discretion to admit or exclude evidence, and we will reverse

only when an abuse of that discretion occurs. *Iqbal v. State,* 805 N.E.2d 401, 406 (Ind. Ct. App. 2004). An abuse of discretion occurs when the trial court determines an issue in a manner that is "clearly against the logic and effect of the facts and circumstances." *Id.*

[22] Generally, evidence that is relevant – that is, evidence that has probative value as to an issue of fact in a case – is also admissible. Ind. Evidence Rules 401, 402. Indiana Evidence Rule 403 provides that where the probative value of the evidence is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needless presentation of cumulative evidence, otherwise relevant evidence may be excluded. Indiana Evidence Rule 404(b) further limits the admissibility of otherwise relevant evidence and provides that while evidence of a person's other crimes, wrongs, or acts may not be used to prove that a person acted in conformity with such other crimes, wrongs, or acts, such evidence may be admissible for other purposes, including proof of motive. In assessing the admissibility of Rule 404(b) evidence, a trial court must undertake a two-step analysis: (1) determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act, and (2) balance the probative value of the evidence against its prejudicial effect. *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997); *Goldsberry v. State*, 821 N.E.2d 447, 455 (Ind. Ct. App. 2005).

[23] With regard to the first step of the inquiry, we have recognized that "where a relationship between parties is characterized by frequent conflict, evidence of the defendant's prior assaults and confrontations with the victim may be

admitted to show the relationship between the parties and motive for committing the crime." *Iqbal*, 805 N.E.2d at 408. With regard to the second step, "'The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission.'" *Goldsberry*, 821 N.E.2d at 455 (quoting *Evans v. State,* 727 N.E.2d 1072, 1079 (Ind. 2000)).

[24] Here, the State offered evidence of an October 2009 incident, for which Haines was ultimately convicted, during which Haines accused Wagers of having slept with a neighbor, and he hit her in the face and strangled her, in the Children's presence. The State also offered evidence of a June 2015 incident, for which Haines faced pending charges, when during an argument Haines pushed Wagers and then shot at her car as she drove away. He also shot her cell phone that she had left at his house. The State offered the evidence of the two prior bad acts to show Haines's motive of control over the victim, and Haines objected that the evidence was unduly prejudicial under Indiana Evidence Rule 403. The trial court admitted the evidence as proper motive evidence, showing the relationship between the parties and a motive – hostility – for the crimes. Prior to the State offering the evidence, the trial court admonished the jury:

> Ladies and gentlemen, you are about to hear some evidence of acts other than those that are charged in this case. This evidence is being received only on the issue of motive and you should consider it - should be considered by you only for that limited purpose.

*Tr. Vol. IV* at 204.

On appeal, Haines acknowledges that "[i]n . . . domestic violence trials, courts often allow evidence of prior domestic violence involving the same victim to show the motive of hostility and give context to the parties' relationship," but he contends that, "[g]iven the [S]tate's other evidence regarding motive and the dissimilarities between the prior incidents and the current incident and the inflammatory nature of the evidence regarding the discharge of a firearm," the State's stated purpose of motive was "too attenuated to justify admission for that purpose." *Appellant's Br*. at 13-14. We disagree with his suggestion that the evidence was "too attenuated" to the present offenses to show motive. Both incidents present a similar factual scenario to the charged conduct in this case. The October 2009 incident stemmed from Haines's suspicions and accusations that Wagers was involved with another man, which is what precipitated the argument in this case. In the 2009 argument, Haines hit Wagers in the face and strangled her in the presence of Children, and, in this case, he similarly hit her, strangled her, and then hit her in the leg with a metal post, in the Children's presence. In the 2015 incident, Haines had pushed Wagers to the ground, and he had fired a shotgun at her car when she attempted to leave; the present case similarly included a battery and a shotgun, with Wagers testifying that Haines made her retrieve his shotgun and place it in the corner of the room and that she was afraid to try to leave the residence until after he had gone to work the next day. We find that the prior bad acts that were admitted were relevant to show the volatile and hostile relationship between Haines and Wagers and Haines's motive for committing the crimes.

Haines also argues that, even if the evidence was relevant to motive, "its prejudicial effect far outweighed its probative value." *Appellant's Br.* at 13-14. We disagree. The trial court did not permit all the evidence that the State had desired to introduce as outlined in its Notice filed before trial; that is, the trial court granted Haines's motion in limine to exclude other uncharged acts of domestic violence as well as past protective orders that Wagers had obtained against Haines. *Appellant's App. Vol. 2* at 109-11. The prior bad acts that were permitted into evidence were limited in scope, were similar to the instant offenses, and involved the same victim, and the trial court gave a limiting instruction to the jury, directing it that the evidence should not be considered for anything other than Haines's motive for engaging in the charged acts. "When a limiting instruction is given that certain evidence may be considered only for a particular purpose, the law will presume that the jury will follow the trial court's admonitions." *Ware v. State*, 816 N.E.2d 1167, 1176 (Ind. Ct. App. 2004); *see also Embry v. State*, 923 N.E.2d 1, 10 (Ind. Ct. App. 2010) (finding that a court's limiting instruction reduced any prejudice from the admission of Rule 404(b) motive evidence of prior acts of violence between the parties), *trans. denied*. Based on the record before us, we find that the trial court did not abuse its discretion when it admitted the Rule 404(b) evidence.

Furthermore, even if it was error to admit the evidence, as Haines claims, it was harmless. That is, "Even when a trial court abuses its discretion in admitting evidence under Rule 404(b), 'we will only reverse for that error if 'the error is inconsistent with substantial justice' or if 'a substantial right of the party is

affected.'" *Stettler v. State*, 70 N.E.3d 874, 881 (Ind. Ct. App. 2017) (quoting *Iqbal*, 805 N.E.2d at 406 and *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind. 1997)), *trans. denied*. Here, the jury acquitted Haines of the rape charge, and the evidence of Haines's guilt on the other charges was substantial, given Wagers's own consistent testimony, which was corroborated by the Children's testimony about hearing the argument in the bathroom, summoning Grandmother because they were scared, observing Haines throw a bike at Wagers, and seeing him place her in a choke hold. Wagers's testimony was also corroborated by her physical injuries. Haines has not shown that he was denied a fair trial by the trial court's decision to admit the challenged evidence. Accordingly, we find no error, let alone reversible error, in the admission of the evidence.

## II. Motion to Dismiss

[28] Haines claims that because the Brown County Sheriff's Department returned Wagers's cell phone to her after it had been forensically examined, and he was thus precluded from having another expert examine the phone, the State failed to preserve materially exculpatory evidence, and Haines's due process rights were violated such that the trial court should have granted his motion to dismiss. We review a trial court's ruling on a motion to dismiss for abuse of discretion. *State v. Durrett*, 923 N.E.2d 449, 453 (Ind. Ct. App. 2010).

[29] "When determining whether a defendant's due process rights have been violated by the State's failure to preserve evidence, we must first decide whether the evidence is potentially useful evidence or material[ly] exculpatory

evidence." *Id*. Materially exculpatory evidence is evidence that "possesses an exculpatory value that was apparent before the evidence was destroyed" and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. (quoting *Noojin v. State,* 730 N.E.2d 672, 675-76 (Ind. 2000) and *California v. Trombetta,* 467 U.S. 479, 489 (1984)). Exculpatory evidence is defined as "[e]vidence tending to establish a criminal defendant's innocence." *Id*. (quoting Black's Law Dictionary 597 (8th ed. 2004)). The State's duty to preserve exculpatory evidence is limited to evidence that might be expected to play a significant role in a defendant's defense. *Id*. Failure to preserve material exculpatory evidence violates due process regardless of whether the State acted in good or bad faith. *Id*.

[30] In contrast, potentially useful evidence is "'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *Blanchard v. State*, 802 N.E.2d 14, 26 (Ind. Ct. App. 2004) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)). The government's failure to preserve potentially useful evidence does not constitute a denial of due process of law "unless a criminal defendant can show bad faith on the part of the police." *Durrett*, 923 N.E.2d at 453. "Bad faith is defined as being 'not simply bad judgment or negligence, but rather implies the conscious doing of wrong because of dishonest purpose or moral obliquity.'" *Blanchard*, 802 N.E.2d at 27-28 (citing *Samek v. State*, 688 N.E.2d 1286, 1289 (Ind. Ct. App. 1997), *trans. denied*).

[31]     Here, the trial court determined that the phone was not materially exculpatory evidence and was, instead, potentially useful evidence and that the State did not act in bad faith. We agree with this determination. Wagers told deputies that Haines had told her that he was recording her, so they collected her phone as potential evidence. The cell phone was then forensically analyzed, and no relevant videos or pictures were found on it; nonetheless, the entirety of the phone's contents was digitally saved and was available to both parties and their experts.[6] Because the phone "could have been subjected to tests, the results of which might have exonerated the defendant" it was potentially useful evidence. *Durrett*, 923 N.E.2d at 453. For any due process violation to have occurred, however, Haines was required to show that the State acted in bad faith. *Id.* In this case, where (1) nothing of evidentiary value was found on the phone, (2) its entire contents were saved, and (3) Wagers needed the phone, the Brown County Sheriff's Department returned it to her. There is no indication that the State attempted to hide or destroy evidence or engaged in conscious wrongdoing. To the extent that Haines suggests that, under the facts of this case, we should "presume" that the State acted in bad faith, that is not the law,

---

[6] We note that, according to the record before us, the State provided a digital copy of the phone to Haines during the trial. *Appellant's App. Vol. 2* at 62-63; *Tr. Vol. V* at 183-90, 234. Haines did not thereafter seek to admit into evidence anything found on the phone.

and we reject that argument. *Appellant's Br*. at 20. The trial court did not abuse its discretion when it denied Haines's motion to dismiss.[7]

## III. Habitual Offender

[32] In May 2017, the trial court imposed a nine-year sentence on the confinement conviction, enhanced by six years for the habitual offender adjudication, two and one-half years on the domestic battery conviction, and one year on the firearm possession conviction, to run concurrent with each other for an aggregate sentence of fifteen years. *Appellant's App. Vol. 2* at 19, 245-48; *Tr. Vol. VI* at 151-52. On appeal, Haines asserts, and the State concedes, that his habitual offender adjudication must be vacated. We agree. When Haines committed the present offenses, Indiana's habitual offender statute, Indiana Code subsection 35-50-2-8(d), stated:

> A person convicted of a felony offense is a habitual offender if the state proves beyond a reasonable doubt that:
>
> (1) the person has been convicted of three (3) prior unrelated felonies; and
>
> (2) if the person is alleged to have committed a prior unrelated:
>
> (A) Level 5 felony;

---

[7] We note that, at the hearing on the motion to dismiss, counsel for Haines argued, among other things, that "[W]e are completely unable to present a defense to count I of rape without that cell phone." *Tr. Vol. II* at 91. The jury found Haines not guilty of the rape charge.

(B) Level 6 felony;

(C) Class C felony; or

(D) Class D felony;

not more than ten (10) years have elapsed between the time the person was released from imprisonment, probation, or parole (whichever is latest) and the time the person committed the current offense.

[33]     As the State acknowledges, all of Haines's prior felonies relied upon for his habitual offender finding were Class D felonies, and in December 2017 our Supreme Court in *Johnson v. State* interpreted Indiana Code section 35-50-2-8(d) and held that each prior lower-level felony used for habitual offender purposes must meet the statute's ten-year requirement.[8] 87 N.E.3d 471, 473 (Ind. 2017). Here, while the State proved that Haines has three prior unrelated felonies, not all three met the ten-year requirement. We thus reverse the habitual offender enhancement and remand to the trial court for resentencing proceedings consistent with this decision.[9]

---

[8] As our Supreme Court observed in *Johnson v. State*, "The legislature has since amended subsection 8(d), which now provides 'not more than ten (10) years have elapsed between the time the person was released from imprisonment, probation, or parole (whichever is latest) for at least one (1) of the three (3) prior unrelated felonies and the time the person committed the current offense.' I.C. § 35-50-2-8(d) (2017)." 87 N.E.3d 471, 473 n.1 (Ind. 2017).

[9] As the State observes, our Supreme Court in *Coble v. State*, 523 N.E.2d 228, 229 (Ind. 1988) held that when a habitual offender enhancement is vacated on appeal, the trial court has the authority on remand to resentence the defendant on the underlying felony to which the habitual enhancement had been attached. *Appellant's Br.* at 27. We note that this court recently acknowledged the *Coble* decision and stated, "[G]iven

Affirmed in part, reversed in part, and remanded.

Bailey, J., and Pyle, J., concur.

---

the relationship between a habitual offender enhancement and the offense to which that enhancement is attached, the trial court does have the authority on remand to resentence the defendant on the attached offense." *Jackson v. State*, 88 N.E.3d 1106, 1110 (Ind. Ct. App. 2017) (holding that the underlying sentence in Jackson's case was not subject to change on remand because, unlike habitual enhancements that "attach" to a particular conviction, the vacated criminal gang enhancement did not attach to a conviction to enhance the sentence), *trans. pending*. Thus, here, the trial court may resentence Haines on the criminal confinement conviction, if it wishes to do so. Our Supreme Court has also held that, on remand, the State in some cases may retry a defendant on the habitual enhancement. *See Calvin v. State*, 87 N.E.3d 474, 479 (Ind. 2017) (reversing habitual offender enhancement as unsupported by sufficient evidence and remanding for retrial on that enhancement); *Dexter v. State*, 959 N.E.2d 235, 240 (Ind. 2012) (reversing habitual offender enhancement and remanding for resentencing, stating, "[R]etrial on a sentencing enhancement based on a prior conviction is permitted even where the enhancement is reversed because of insufficient evidence.").