## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 17 2019, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Austin & Jones, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher Barnes,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | January 17, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1715<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Clark Rogers, Judge<br><br>The Honorable Stanley Kroh, Magistrate<br><br>Trial Court Cause No.<br>49G03-1705-F5-17234 |

**Brown, Judge.**

[1] Christopher Barnes appeals his convictions for battery resulting in serious bodily injury as level 5 felonies. We affirm.

## Facts and Procedural History

[2] On May 2, 2017, Barnes and T.G. started to fight when T.G. received a message from another man. T.G. entered the shower with Barnes, and Barnes asked her about the message and "started . . . choking [her] and stuff." Transcript Volume 2 at 62. T.G. fell over and hit her head on the tub. At some point Barnes and T.G. moved to the bedroom, and Barnes closed the door. Barnes struck T.G. with a belt, and T.G. tried to pull the covers up because it hurt. Barnes turned the belt and started hitting T.G. with the buckle, she kept trying to pull the covers up, and Barnes picked up a hanger and started to hit her with it. Barnes took T.G. to Community North because she was in pain. At Barnes's direction, T.G. told the hospital staff that she "got jumped." *Id*. at 66. The next day, Barnes was in the driver's seat and T.G. was in the passenger seat of a vehicle, and Barnes hit T.G.'s left side and pushed her head against the window using a lot of force. T.G. was in pain, and it hurt her side to breathe.

[3] On May 4, 2017, Barnes brought T.G. to a health clinic for an unrelated follow-up visit. Barnes did not come in with T.G. but was still on the grounds. T.G. told the clinic staff what had happened to her. A nurse practitioner observed that T.G. appeared to be in acute pain and very upset and scared, became concerned for T.G.'s safety based on T.G.'s statements to her, and moved T.G. to a more secure location in the clinic. The nurse practitioner walked to the waiting area and observed Barnes enter the waiting room and walk quickly in

her direction. Barnes asked where T.G. was located, the nurse practitioner asked Barnes for his name, Barnes said "Frank," the nurse practitioner told him "[i]f you are Christopher Barnes, you need to leave because the police have been called," and Barnes turned around and exited through the door. *Id.* at 95-96. The nurse practitioner observed that T.G.'s heart rate was very fast and she had a low-grade fever and extensive bruising all over her. T.G. was transported to Eskenazi Hospital by ambulance. Barnes entered T.G.'s hospital room and stayed the night. At some point, a person who T.G. thought was a counselor for the hospital came into her room with a clipboard, Barnes took the clipboard from the person, and T.G. "just tried to basically have her, like, just be quiet, uhm, because he was in there." *Id.* at 74.

[4] On May 10, 2017, the State charged Barnes with: Count I, battery resulting in serious bodily injury as a level 5 felony for striking T.G. with his hands and/or belt and/or hanger on or about May 2nd; Count II, battery by means of a deadly weapon as a level 5 felony; Count III, battery resulting in moderate bodily injury as a level 6 felony; Count IV, battery resulting in serious bodily injury as a level 5 felony for striking T.G. with his hands on May 3rd; Count V, battery resulting in moderate bodily injury as a level 6 felony; Count VI, intimidation as a class A misdemeanor; and Count VII, domestic battery as a class A misdemeanor.

[5] Prior to Barnes's trial, T.G. wrote a letter to the court and two letters to the prosecutor. She wrote to the prosecutor that Barnes is innocent and that she objected to the State filing charges and seeking her medical records. In the

letter to the court, she wrote "Christopher Barnes is not liable for my physical injuries," "I was involved in a noisy argument that resulted in me to be striked several times by several females," "Because of the intentions of my boyfriend Christopher Barnes . . . cutting his ties with me were coming about I became very emotional with worry, nervousness, and fear that he would leave me," "I wildly and unthinkingly connected him to my injury," and "I only spoke falsely to connect him to my injury because I fully understand that connecting Christopher Barnes to my injury was unwise and lacking good sense of judgement because Christopher Barnes was not connected to my injury in no shape or form." State's Exhibit 29.

[6] Barnes filed a motion in limine which requested in paragraph 2 that the court exclude any expert testimony by domestic violence nurses or others and argued that such testimony is improper vouching and bolstering and only serves to bias and prejudice the jury. At a hearing, the prosecutor stated that the State planned to present the expert testimony of Dawn Higgins regarding why a person might recant after a crime, and Barnes's counsel argued that the testimony reeks of bolstering and vouching, the person had no specific knowledge of this particular case, there was no reason for an expert witness, and the testimony was of no relevance. The court took paragraph 2 of the motion under advisement.

[7] At Barnes's trial, the State presented the testimony of T.G., photographs of her injuries, and medical records. T.G. testified as to Barnes's actions on May 2nd and 3rd and her visits to the hospitals on May 2nd and 4th. With respect to her

letters, T.G. indicated that Barnes had written the letters originally, that he told her to rewrite them in her own handwriting, and that she felt she had to write the letters. T.G. testified as to her injuries, and a nurse practitioner described her observations of T.G. at the clinic including bruising below her left eye, a contusion on her forehead, a bite mark on her upper back and other bite marks on her body, bruising on her arm and ankle, and severe bruising on her legs, all as depicted in the photographs.

[8] The State also presented the testimony of Dawn Higgins as a domestic violence expert. The prosecutor, outside the presence of the jury, stated:

> I essentially have the hypothetical with two questions. Assume a woman is in an intimate relationship with a man with whom she lives [], who was also provided transportation by him. Now, assume the man physically attacked the wom[a]n over several days because he was angry about her not telling him what he wanted her to tell him, or not doing what he wanted her to do. Ultimately, he took her to a hospital and was with her in the hospital while she spoke with staff. Why might she initially give a different explanation about where she received her injuries? The next question. Now, assume she is alone at the hospital and she explained her intimate partner abused her. Why might she later recant those statements[?]

Transcript Volume 2 at 162. Barnes's counsel objected to "the first question" and stated "I think it is so specific that it's almost an opinion on the open issue here, uhm, and would invade the province of the jury." *Id.* Defense counsel also stated "I'm objecting, Judge to the -- just that there are so many facts that it's almost not even a hypothetical anymore, it's the exact situation" and "I would say, I think if the State wants to ask it in a different way where there are

less . . . specifics and more focus on just what the issue is at the tail-end and not with the un-necessary specific facts." *Id*. at 163. The prosecutor replied "[s]o - and the reason the I was - in the Odom case,[1] they are very specific and they give very specific details. And the reason I am specific with this hypothetical is because she has not met [T.G.]," "[s]he is going off of what I'm giving her, and I need to give her the facts that are - that [T.G.] got out on the stand, because we need to specifically tailor the hypothetical and her responses to the facts that we have in evidence," and "what I read are all things that we have in evidence." *Id*. Barnes's counsel stated: "I would say my main issue is the why in front, because he was angry and so the word 'ultimate.' I think if that portion's cut out, that's my biggest complaint." *Id*. at 164. The prosecutor stated "[c]an I say -- okay, so assume the man physically attacked the woman over several days. Ultimately, he took her to a hospital." *Id*. The court stated "I think that's fair." *Id*. The court also asked "I'm assuming you want the Court to recognize your continuing objection based on our previous hearings," and Barnes's counsel replied affirmatively. *Id*. at 165.

[9]     Later, in the presence of the jury, the prosecutor questioned Higgins as follows:

> Q.     Okay. Now, at this point I want to just give you a
>         hypothetical situation and I'm going to ask you a question
>         about it. Okay?
>
> A.     Okay.

---

[1] *Odom v. State*, 711 N.E.2d 71, 77 (Ind. Ct. App. 1999), *trans. denied*.

Q.    You were not involved in the case that we are here today about; is that correct?

A.    As far as I know I've not had any association with it whatsoever.

Q.    Okay.  Now, I want you to assume there's a woman who is in a intimate relationship with a man.  Sh [sic] was with that man and she is provided transportation by him.  Now, assume that he physically attacked her over several days and ultimately took her to a hospital and he was with her while she was in the hospital, while she spoke with staff.  Why might she initially give a different explanation about why -- how she received those injuries?

A.    She's actually in the room with the person who caused the injuries and if that fear level is extremely high, which one would assume that it is, then it would likely be in her best interest to – it's almost safer to go ahead and tell the lie, if you will, than to deal with the consequences of what could happen if you did not -- if you did not cover for that situation.  Uhm, it's oddly safer, believe it or not because that person that caused the injury is right there in the room with you and it would be almost like defying someone who's -- you're in an armed robbery and you're becoming defiant toward that person, they've got the tool and the weaponry to cause you further injury.

Q.    Now, I want to give you another question.  Uhm, the same initial circumstances, but now assume she's at the hospital alone and she explains that it was her intimate person who abused her.  Why might she at a later date recant those statements?

A.    Well, primarily because it's hard for a lot of people to understand if they haven't had this experience in their life, but they do have natural intimate relationships, so there are feelings and emotions attached to that relationship.  Likewise, it's – it's actually almost a fear of the unknown versus -- versus what I know.  Know[n] versus unknown

circumstances. So if I'm in a situation where I can actually predict and almost prepare for what might happen, as opposed to if I leave, or if I exit and especially if I don't have, like, tools or resources, then I'm wondering [sic] out into the unknown where I may not even have housing. And, uhm, there's a reliance and a codependence and a dependence on that -- in that situation that is often seen, where there's just a lack of an ability to separate from that for dozens and dozens of reasons, just because it doesn't happen in a vacuum. But the other thing is the lethality of these situations expedientially [sic] goes up when, uh, a person who tries to flee, because the danger level just increases beyond measure almost. It's -- the majority of the time an individual that is going to be killed in a relationship such as that --

*Id*. at 176-178. At that point, defense counsel objected, stating "I think this is beyond --," and the court sustained the objection. *Id*. at 178. On cross-examination, Higgins indicated that every intimate relationship is different, that some of the generalizations she discussed may not apply to every situation or to this situation, there are many reasons why a person would accuse another person of domestic violence, and she had seen situations where an alleged victim made up a story of domestic violence or lied about who committed the violence. The jury found Barnes guilty on Counts I through V and VII, and the court vacated Counts II, III, V, and VII and sentenced Barnes to consecutive terms of four years on Count I and three years on Count IV.

### Discussion

[10] The issue is whether the trial court abused its discretion in admitting Higgins's testimony. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling

on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. "We do not reweigh the evidence; rather, 'we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant.'" *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016) (quoting *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015)). However, we will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[11] Barnes asserts the trial court abused its discretion in allowing Higgins to testify. He argues that Higgins's opinions were irrelevant because the hypotheticals did not contain facts supporting her opinion. He argues, with respect to the first hypothetical, that no facts were alleged regarding the degree of fear of being with the alleged assailant in the hospital and that the second hypothetical did not present facts of dependence and no such facts were adduced during trial. He argues that Higgins's testimony likely had substantial impact upon the jury because it was presented by an "expert." Appellant's Brief at 12.

[12] The State asserts that Barnes has waived the issue and that he argues for the first time on appeal that Higgins's testimony was irrelevant. It argues that Higgins's testimony was relevant to show T.G.'s motive in not reporting the

battery sooner and her potential reasons for recanting. The State argues that the hypotheticals posed to Higgins were similar to the facts presented at trial, that even defense counsel acknowledged the factual similarities, and that Higgins's testimony was relevant because it was based on circumstances similar to those faced by T.G. The State further argues that Higgins had no personal knowledge of the case, the jury was able to accept or reject her testimony as it applied to the case, Higgins did not vouch in any way for T.G. and did not comment on whether T.G.'s reactions were appropriate or she behaved as someone who had been a victim of domestic abuse, the probative value of the testimony was not outweighed by its prejudicial effect, and in any event any error in admitting the testimony was harmless.

[13] Even assuming that Barnes did not waive his arguments on appeal, reversal is not warranted. Ind. Evidence Rule 401 provides that evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Evidence Rule 403 provides that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. The court may admit expert testimony under Ind. Evidence Rule 702. It is within the trial court's sound discretion to decide whether a person is qualified as an expert. *Iqbal v. State*, 805 N.E.2d 401, 409 (Ind. Ct. App. 2004). Ind. Evidence Rule 704(b) provides that witnesses may not testify to opinions concerning intent, guilt, or innocence

in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions. However, expert testimony explaining the behavior of domestic violence victims which is not based upon personal knowledge does not constitute impermissible vouching. *See Otte v. State*, 967 N.E.2d 540, 548 (Ind. Ct. App. 2012) (citing *Iqbal*, 805 N.E.2d at 409-410), *trans. denied*.

> As this court has previously observed, the reactions and behaviors of domestic violence victims are not commonly understood by laypersons. *Odom v. State*, 711 N.E.2d 71, 75 (Ind. Ct. App. 1999), *trans. denied*. Consistent with this view, this court has endorsed the use of expert testimony about domestic abuse/battered woman syndrome to explain witness recantation. *See id.* at 72 n.2, 77 (domestic abuse); *Carnahan v. State*, 681 N.E.2d 1164, 1166-68 (Ind. Ct. App. 1997) (battered woman syndrome); *see also Iqbal*, 805 N.E.2d at 409-10 (affirming use of expert testimony to "educate[] the jury on the complexity of behavior of domestic violence victims")[.] [T]estimony regarding a victim's propensity to recant in this context simply provides the jury with information outside its experience, permitting it to assess credibility based upon a more complete understanding of all potential factors at issue.

*Id*. Further, this Court observed in *Odom* that the State's domestic violence expert "did not have personal knowledge of the case and had not counseled" the victim and that, "[t]herefore, the State properly presented the expert with and sought a response based upon a hypothetical question supported by facts which had been adduced at trial." 711 N.E.2d at 77 (citing *Henson v. State*, 535 N.E.2d 1189, 1192 (Ind. 1989) (hypothetical question proper if it embraces facts that have been placed into evidence); *Ashby v. State*, 486 N.E.2d 469, 475 (Ind. 1985) (hypothetical question may be used to obtain expert's opinion when

expert has no personal knowledge of the facts), *reh'g denied*).  The Court held that an expert's testimony is relevant if it is "based upon some fact presented in the hypothetical or some reasonable inference drawn therefrom."  *See id*.

[14]     The record reveals that at the hospital on May 2, 2017, T.G. said that she "was jumped" and, later by letter, stated that she was attacked by a group of women and not Barnes.  Transcript Volume 2 at 66.  However, T.G. indicated to the staff at the clinic on May 4, 2017, what had happened to her and later testified at Barnes's trial that Barnes was the person who attacked her and caused her injuries.  Higgins indicated that she did not have personal knowledge of the case, and the State then presented Higgins with and sought a response based upon hypothetical questions supported by facts which had been adduced during the trial including that a woman had a relationship with a man, she was provided transportation by him, he physically attacked her over several days, and he was with her while she was in the hospital and spoke with staff.  Higgins's testimony related to the reasons a person who has been the victim of domestic violence may not disclose the actions of the perpetrator at certain times or under certain circumstances.  Higgins did not give her opinion regarding whether T.G. had testified truthfully.

[15]     Based upon the record, we cannot say that Higgins's testimony was not relevant or that its probative value was substantially outweighed by the danger of unfair prejudice.  The trial court did not abuse its discretion in admitting the challenged testimony.  *See Iqbal*, 805 N.E.2d at 409-410 (noting that the State offered expert testimony to explain a victim's reason for allowing the defendant

to enter her home despite testimony he previously assaulted her and that the expert did not have personal knowledge of the case and merely educated the jury on the complexity of behavior of domestic violence victims, and holding the expert's testimony did not constitute impermissible vouching and was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice).

[16] Further, the record reveals that T.G. testified in detail regarding Barnes's actions of striking her using a belt, a belt buckle, and a hanger on May 2, 2017, and striking her on May 3, 2017. The State presented testimony from medical personnel who provided care for T.G., photographic evidence of T.G.'s injuries, and her medical records. We conclude based upon our review of the evidence as set forth above and in the record that any alleged error in the admission of the challenged testimony was harmless in light of the other substantial independent evidence of Barnes's guilt.

[17] For the foregoing reasons, we affirm Barnes's convictions.

[18] Affirmed.

Bailey, J., and Bradford, J., concur.